IN RE: APPEAL OF AND PETITION FOR JUDICIAL REVIEW BY
ARCADIA DAIRY FARMS, INC. OF AMENDMENT NO. 27 TO
MILK MARKETING ORDER NO. 2

No. 17

(Filed 6 April 1976)

1. Agriculture § 16— powers of Milk Commission

The Milk Commission, being an administrative agency created by
statute, has no regulatory authority except such as is conferred upon
it by Chapter 106, Art. 28B, of the General Statutes.

2. Statutes § 4— construction — avoidance of unconstitutionality

If a statute is reasonably susceptible of two constructions, one
of which will raise a serious question as to its constitutionality and
the other will avoid such question, the courts should construe the
statute so as to avoid the constitutional question.

3. Agriculture § 16— distribution of "reconstituted" milk — equalization
payments for producers — authority of Milk Commission

The Milk Commission was not authorized by G.S. 106-266.8 to
require a distributor of milk "reconstituted" from Wisconsin milk
powder to make compensatory payments to North Carolina milk pro-
ducers with whom it has no dealings based upon the difference in the
price of fluid milk and the price of surplus milk; furthermore, if
the statute authorized such requirement, it would probably be in con-
flict with the Commerce Clause of the United States Constitution
and Article I, § 19 of the North Carolina Constitution.

4. Agriculture § 16— construction of milk pricing statute

The provision in G.S. 106-266.9 that "the Commission may pro-
hibit such practices as it may deem to be contrary to the welfare of
the public and the dairy industry, such as the use of special prices
or special inducements in any form or any unfair trade practices in
order to vary from the prices fixed by the Commission" applies only
to the pricing of milk and practices designed to bring about variations
from the prices fixed by the Commission.

APPEAL by Arcadia Dairy Farms, Inc., from *McKinnon, J.,*
at the 16 June 1975 Session of WAKE, heard prior to determina-
tion by the Court of Appeals.

Arcadia Dairy Farms, Inc. (hereinafter called Arcadia),
is a producer and a distributor of fluid milk in Marketing Area
No. 8 in North Carolina (Asheville and vicinity). The North
Carolina Milk Commission (hereinafter called the Commission)
is an agency of the State, created by and having the authority
conferred upon it by Article 28B of Chapter 106 of the General
Statutes.

In re Dairy Farms

On or about 10 April 1974, the Commission, following a public hearing, adopted Amendment No. 27 to its Milk Marketing Order No. 2. Arcadia filed its petition for a judicial review thereof by the Superior Court of Wake County. Arcadia sought and obtained from the Superior Court an order restraining the enforcement of the amendment by the Commission until the hearing of the matter in the Superior Court. It alleged Amendment No. 27 is in excess of the statutory authority of the Commission and, if not, the statute authorizing the Commission to promulgate the amendment is unconstitutional and void for that: (1) It is an unlawful delegation of legislative power to the Commission since it fails to establish adequate standards for the guidance of the Commission; (2) it constitutes an unlawful burden upon interstate commerce, in violation of the Constitution of the United States, Article I, Sec. 8, Clause 3; (3) it is confiscatory and levies a tax not enacted by the General Assembly, in violation of the Constitution of North Carolina, Article I, Sec. 8; and (4) it is in violation of the Fourteenth Amendment to the Constitution of the United States and of Article I, Sec. 19, of the Constitution of North Carolina.

The Superior Court, after hearing, concluded the action of the Commission in promulgating the said amendment is not in violation of constitutional provisions, is within the statutory authority and jurisdiction of the Commission, was made upon lawful procedure, is not affected by other error of law, is supported by competent, material and substantial evidence, in view of the entire record as submitted, and is not arbitrary or capricious. The Superior Court, therefore, adjudged that the decision of the Commission adopting the amendment be affirmed, vacated the interlocutory stay order and directed the payment to the Commission of funds deposited by Arcadia and held in escrow pending the adjudication of this matter. By consent of the parties, the judgment of the Superior Court was stayed pending the determination of this appeal.

Nothing in the record indicates that any fluid milk sold or distributed by Arcadia is not wholesome, falls short of the highest standards of purity established by law for the types of milk it purports to be, is in any way misrepresented to the consumer as to content and quality, or is, in any respect, lower in quality than the purportedly comparable product of any of the other five distributors of fluid milk in the Asheville area.

The designations "Class I" and "Class II" hereinafter referred to, do not relate to the quality of the fluid milk but such classification is determined solely by the use made by the distributor (the processor) of fluid milk received from the producer (the dairy farmer) and determines the price paid by the distributor, at the end of each payment period, to the producer for the fluid milk received from the producer by the distributor. This classification of milk (to be distinguished from the grading of milk by the Department of Agriculture pursuant to G.S. 106-267) was not established by statute, but by the regulation of the Commission. With refinements and exceptions not here material, the Commission's Milk Marketing Order #2 defines Class I milk to include all fluid milk and fluid milk products "sold or disposed of for consumption or use as processed fluid milk products" and specifically includes "reconstituted milk." Class IA milk includes all bulk milk sold to other distributors, milk transferred between branches of the same distributors for use as fluid milk and milk sold directly to military installations. Class II milk is all other milk *received* by the distributor. That is, Class II milk includes milk used by the distributor or sold by it for use in the production of butter, cheese, milk powder and other non-fluid milk products. With reference to the demand for milk for use as fluid milk, it is surplus milk.

Records are kept by the distributor showing its use of all milk received by it during a payment period, and at the end of such period the distributor makes payment to the producer for all milk delivered by the producer to the distributor during such payment period, the payment for Class I milk being at a higher rate than the payment for Class II milk. Records are not kept by the distributor to show the use so made of milk purchased from each individual producer, the classification for payment purposes of each producer's milk being in the same proportion as the classification of the total volume received by the distributor during the payment period.

Arcadia is a producer. That is, it has its own dairy herd, all of the milk derived from which is distributed by Arcadia. (The record in Case No. 18, a companion case decided this day, indicates that the herd is actually owned by individuals, or an individual, who own or owns all of the stock of Arcadia, but, for the purpose of this litigation, Arcadia has been regarded and is deemed to be the owner of the dairy herd and, therefore,

a producer-distributor.) Arcadia distributes in the Asheville area fluid milk for consumption for use as such. Its total distribution amounts to approximately six per cent of the total fluid milk sales in that area, there being five other distributors in the Asheville area and Arcadia being, apparently, the smallest. Approximately half of the fluid milk so distributed by Arcadia is "reconstituted milk," processed by Arcadia. This is a low fat milk.

Arcadia's reconstituting process is substantially as follows: It purchases from a supplier in Wisconsin (now a supplier in Tennessee according to the record in Case No. 18) milk powder produced from fluid milk (Grade A milk, apparently). This it mixes with water, obtained from Arcadia's private well, and other milk solids to give the resulting fluid the desired butterfat content, palatability and other nutritious qualities. It then mixes that fluid with an equal amount of whole, natural milk (Class I). The end product is then packaged and sold for consumption or other use as fluid milk. Thus, the end product (one-half of Arcadia's total distribution, approximately three per cent of the total distribution in the Asheville area) constitutes fluid milk which, itself, is composed of 50 per cent Class I milk and 50 per cent Class II milk, the latter portion being composed of the milk powder purchased out of State, the other milk solids and the water from Arcadia's well.

Amendment No. 27 to Milk Marketing Order No. 2, the regulation here in question, provides:

"To protect the stability of the supply of producer milk, no Class I or Class IA milk shall be purchased, received, handled, or obtained from any source other than from approved producers or other North Carolina licensed distributors without the express permission of the Commission.

"If a distributor reconstitutes milk for Class I sales, such distributor shall pay into an equalization fund an amount equal to the difference between the price of Class I and Class II milk. * * *

"The amount due to the equalization fund shall be determined and paid each month to the Commission. The amount collected shall be distributed in accordance with a procedure approved by the Commission *for payment to*

*the producers selling to other distributors* within the market area * * * ." (Emphasis added.)

Pursuant to this amendment, the Commission has ordered Arcadia to make payments, substantial in amount, to its "equalization fund." Pending the determination of this proceeding, these payments have, by consent, been paid into a fund held in escrow.

Evidence at the hearing before the Commission was to the effect that at the time Arcadia processed and distributed such "reconstituted milk," there was available in the Asheville area natural, fluid milk which it could have purchased from its competitor distributors, or, perhaps, directly from producers. Had it done so, the producers of such milk would have received from the distributors supplied by them payment for their milk at Class I rates. Since Arcadia did not purchase and use such milk, but used Wisconsin powder plus Arcadia's water to produce "reconstituted milk" for sale to its customers, the milk so left in the hands of Arcadia's competitor distributors became, to them, surplus milk and was used or sold by them for Class II purposes and, consequently, the producers of such milk received therefor, from the distributors suplied by them, payment at the Class II rate.

The effect of the Commission's order is that Arcadia must pay to the Commission the difference between the Class I price and the Class II price on its total volume of "reconstituted" milk less the portion thereof which, itself, consists of natural, fluid milk. That is, Arcadia is ordered to pay to the Commission the difference between the Class I price and the Class II price per volume unit multiplied by the volume of Wisconsin powder plus Arcadia's water. Payments so made by Arcadia to the Commission will be distributed by the Commission to those producers who delivered their milk, not to Arcadia but to Arcadia's competing distributors.

No one in North Carolina manufactures the milk powder used by Arcadia in its processing of reconstituted milk. Arcadia is the only distributor of such milk in the Asheville area.

Evidence at the hearing conducted by the Commission included the following testimony by proponents of the adoption of the amendment in question:

"We have a real problem in Western North Carolina in that one processor, by recombining milk powder and

water, is taking our Class I sales in the marketplace. * * * We found that if the prices were set after studying the matter through the Milk Commission staff that the reconstituted products would probably take a lower price than the whole milk from the cow, which wouldn't solve our problem."

\*      \*      \*

"[T]here has been and still is a surplus of raw milk in this Asheville Market since November of 1973. Biltmore [a distributor] has experienced a surplus, and it is my understanding that the other distributors in the area, Pet, Sealtest, and Dairymen, Inc., have likewise had a surplus of milk. There has been no contact whatever with Biltmore or any of its representatives by representatives of Arcadia Dairies during this period seeking raw milk * * * . With regard to the distributors they are plainly and clearly unable to compete with this product under the present status of the regulations. They cannot sell below cost. They cannot market their product, this product, recombined milk, without paying full Class I price for it, and, in addition, the cost of the powder itself. * * * They [Arcadia] are selling it, having a cost of the raw product at Class II prices. * * * [W]e cannot in good conscience recommend that the Commission, instead of this amendment, relax their regulations on marketing of combined milk and allow all other distributors to compete. I believe that would aggravate the problem instead of solving it. As distributors, I submit we must be allowed to either have a corrective measure in the form of this amendment as proposed, or by relaxing the requirements of our having to [pay] Class I prices for recombined milk."

\*      \*      \*

"Our [North Carolina] dairy farmers cannot economically compete with milk powder and continue to produce fresh and wholesome fluid milk. Our farmers must receive the Class I price for a majority of their production to even have a chance of surviving. They can compete with fluid milk from the mid-west area, the area which produces most of the dry milk powder available for commercial trade. The March, 1974, Federal Order Minimum Class I price in the Minneapolis-St. Paul market is $9.16 per hundredweight. Any distributor in the Asheville area receiving this

fluid milk from the mid-west could expect to pay at least $2.50 per hundredweight for handling and transportation charges, making his total cost approximately $11.66 per hundredweight or at least $1.00 more than the current Class I price in North Carolina.

"However, surplus milk in the mid-west used for manufacturing dry milk powder is purchased by mid-west plants for about $8.00 per hundredweight, which includes the commercial components of butterfat and non-fat milk solids. This simply means that dry milk powder delivered to processors in Asheville does not bear the high transportation costs for the fluid components that have been removed and does reflect the lower prices paid mid-west farmers for their surplus milk.

"A North Carolina distributor who reconstitutes fluid volume from milk powder and water has an ingredient cost of approximately $5.33 per hundredweight for milk solids—non-fat. This is computed on $.65 per pound cost for powder with 8.2 pounds of powder per hundredweight of fluid volume. The $5.33 cost does not include the cost of water and labor.

"A North Carolina processor and distributor with a full supply of local producer milk is required to pay his dairy farmers $10.62 per hundredweight for Class I milk. When a distributor removes the fat to obtain a fluid skim product, the fat value is computed at 3.5 pounds at $.70 per pound to be $2.45. Therefore, $10.62 less $2.45 equals $8.17 as the fluid skim value and this does not include plant costs of separation and processing.

"At the very minimum, this reflects a raw product cost advantage of $2.84 per hundredweight or $.245 per gallon to a distributor who elects to deliberately not buy locally produced milk, but to use milk powder to reconstitute fluid volume for consumer sales. * * *

"To go a step further, if Arcadia Dairy is allowed to continue with its raw product cost advantage, no doubt every processor in the State will quickly go in this direction. During the month of January, 1974, there were 5,157,000 pounds of low-fat product sold in North Carolina. If one-half of this sales volume is lost to the powder reconstitution method, this would cost North Carolina Grade

In re Dairy Farms

A dairy farmers $87,669 per month. (2,578,500 pounds x $3.40 per hundredweight.) * * * The only alternative is higher class prices for their product."

Evidence introduced before the Commission by the opponents of the amendment included the following testimony:

"The effect of this amendment would be to increase the cost of reconstituted milk by 15¢ to 25¢ per gallon. * * * What we [the North Carolina Consumer Council] are saying * * * is that the consumer should be allowed the freedom of choice, whether it's a less expensive reconstituted product versus a more expensive whole milk product, or if Mrs. Housewife so desires, to buy her own powder and mix it herself."

*     *     *

"Arcadia puts out, I believe, somewhere in the neighborhood of 30,000 gallons of milk of one sort or the other per month. Now, 15,000 of this is fresh whole milk. Now, this should have no effect on the market up there. If he has 5% of the market, which we question somewhat—it was close to 4%—but whatever the percentage, it's small—then when you talk about reconstituted milk you are talking about approximately 2% of that market, and as I understand, the reconstituted milk in itself consists of approximately 50% whole milk. So you see we are talking about just a very small amount compared with the total market in the actual area.

*     *     *

"Now, there is no question but what this reconstituted milk apparently serves a need because otherwise these housewives would be going straight to the shelf and making their own. But they can't put that together with the palatability that their children will drink."

The Commission's Milk Marketing Order No. 2 prescribes regulations pursuant to which a producer establishes his milk base in a marketing area. The order further provides that a producer who has established a base in any marketing area shall be entitled to continue to ship all his milk to the distributor with whom his base is established. The producer may transfer his base to another producer. The producer may also transfer his business from one distributor to another.

*Robert B. Long, Jr., for appellant.*

*Harris, Poe, Cheshire & Leager by W. C. Harris, Jr. for appellee.*

LAKE, Justice.

[1] The Milk Commission, being an administrative agency created by statute, has no regulatory authority except such as is conferred upon it by Chapter 106, Art. 28B, of the General Statutes. *Utilities Commission v. Merchandising Corp.*, 288 N.C. 715, 722, 220 S.E. 2d 304, 308 (1975); *Milk Commission v. Galloway*, 249 N.C. 658, 664, 107 S.E. 2d 631 (1959). The powers conferred upon the Commission are set forth in G.S. 106-266.8, the pertinent portions of which read as follows:

> "The Commission is hereby declared to be an instrumentality of the State of North Carolina, vested with power:
>
> \* \* \*
>
> "(3) To supervise and regulate the transportation, processing, storage, distribution, delivery and sale of milk for consumption; provided that nothing in this Article shall be interpreted as giving the Commission any power to limit the quantity of milk that any producer can produce, nor the power to prohibit or restrict the admission of new producers.
>
> \* \* \*
>
> "(7) To make, adopt, and enforce all rules, regulations and orders necessary to carry out the purposes of this Article. \* \* \*
>
> "(10)a. The Commission, after investigation and public hearing, may fix prices to be paid producers and/or associations of producers by distributors in any market or markets, and may also fix different prices for different grades or classes of milk. \* \* \* "

G.S. 106-266.9 further provides:

> " \* \* \* No distributor shall violate the prices as established by or filed with the Commission or offer any discounts or rebates without authority from the Commission; and the Commission may prohibit such practices as it may deem to be contrary to the welfare of the public

and the dairy industry, such as the use of special prices or special inducements in any form or any unfair trade practices in order to vary from the established prices. * * * "

By Amendment 27 to Milk Marketing Order #2 the Commission has undertaken to require one, who purchases, from within or without the State, powdered milk, mixes it with water and, possibly, other substances, thereby "reconstituting" fluid milk, which he distributes to consumers in this State, to pay money to North Carolina producers of natural, fluid milk, from which producers he has purchased nothing and with which producers he has had no business dealing. The purpose of the Commission in so doing is to assure an adequate supply of fluid milk in North Carolina markets by providing for producers of natural fluid milk the same gross revenues they would have received had the distributor of the "reconstituted" milk purchased from such producers natural, fluid milk and distributed it instead of the "reconstituted" milk.

Arcadia contends that the statute, above quoted, does not authorize the Commission to require such payment by it. Arcadia further contends that if the statute, properly construed, does authorize the Commission to impose such requirement, the statute, as applied to Arcadia, violates both the Constitution of North Carolina and the Constitution of the United States.

[2]    If a statute is reasonably susceptible of two constructions, one of which will raise a serious question as to its constitutionality and the other will avoid such question, it is well settled that the courts should construe the statute so as to avoid the constitutional question. *Milk Commission v. Food Stores*, 270 N.C. 323, 331, 154 S.E. 2d 548 (1967) ; *State v. Barber*, 180 N.C. 711, 104 S.E. 760 (1920). In *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, 1361 (1936), the Supreme Court of the United States said: "The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same." See also: *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed 598 (1931) ; *Federal Trade Commission v. American Tobacco Co.*, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786 (1924) ; *Re Keenan*, 310 Mass. 166, 37 N.E. 2d 516, 137 A.L.R. 766

(1941) ; 16 Am. Jur. 2d, Constitutional Law, § 146, 16 C.J.S., Constitutional Law, § 98 (b).

Arcadia purchases its milk powder from a supplier located in Wisconsin (or Tennessee). Presently, there is no producer of such powder in North Carolina. If Arcadia, having paid the price of the Wisconsin powder, the water and other ingredients of its "reconstituted" milk plus the labor cost of the reconstituting process, must also pay to its competitor distributors, for the benefit of their producers, the difference between the price of Class I milk and the price of Class II milk, the flow of the Wisconsin product into this State will be severely restricted, if not stopped altogether. In this respect, the effect would be the same as that produced by a North Carolina protective tariff.

In *Baldwin v. Seelig*, 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), the Supreme Court of the United States, in an opinion by Mr. Justice Cardozo, held that the State of New York may not forbid the sale therein of milk brought into New York from Vermont unless the price paid to the Vermont producers was one which would have been lawful upon a like transaction within the State of New York. The Court said:

> "Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. * * * Imposts and duties upon interstate commerce are placed beyond the power of a state, without the mention of an exception, by the provision committing commerce of that order to the power of the Congress. Constitution, Art. I, § 8, Clause 3. * * *

> "The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk; the supply being put in jeopardy when the farmers of the state are unable to earn a living income. * * * This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition

from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end to our national solidarity. * * *

"Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents. Restrictions so contrived are an unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin. They are thus hostile in conception as well as burdensome in result. * * * The importer must be free from imposts framed for the very purpose of suppressing competition from without and leading inescapably to the suppression so intended."

In *United States v. Rock Royal Co-op.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939), the Court sustained Federal regulations, pursuant to an Act of Congress, establishing a system for fixing prices to be paid to producers of milk through equalization pools which distributed the total value of all milk sold in a specified market among the producers supplying that market. However, in *Hood v. Dumond,* 336 U.S. 525, 539, 69 S.Ct. 657, 93 L.Ed. 865 (1949), the Court, noting its decision in the Rock Royal case, nevertheless held that the State of New York could not constitutionally deny a Boston distributor the right to establish a facility within the State of New York for the purchase there of milk for shipment to the Boston market, saying, through Mr. Justice Jackson:

"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality."

In *Lehigh Valley Cooperative Farmers, Inc. v. United States,* 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed. 2d 345 (1962), the Court held invalid "compensatory payment" provisions included

in milk marketing orders promulgated by the Secretary of Agriculture. The provision in question required those who purchased milk outside the marketing area and brought it into the area for sale as fluid milk to pay to the farmers who supplied the area a fixed amount, measured (as is true in the present case) by the difference between the minimum price set by the Market Administrator for fluid milk and the minimum price for surplus milk. There the Court said the regulation violated the Act of Congress, which provided, "No * * * order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States." While the Lehigh Valley case did not involve the question of the validity of state action in the light of the Commerce Clause, it recognized that a "compensatory payment" plan, similar to that now prescribed by the order of the North Carolina Milk Commission, would effectively limit the flow of milk from one area into another.

In *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), the Court held violative of the Commerce Clause an ordinance of the City of Madison, Wisconsin, forbidding the sale therein of milk, as pasteurized, unless such milk was processed and bottled at an approved plant within a radius of five miles from the central square of the city. Speaking through Mr. Justice Clark, the Court said:

"But this regulation, like the provision invalidated in *Baldwin v. Seelig, supra, in practical effect* excludes from distribution in Madison wholesome milk produced and pasteurized in Illinois. * * * In thus erecting an economic barrier protecting a major local industry against competition from without the State, Madison plainly discriminates against interstate commerce. This it cannot do, even in the exercise of its unquestioned power to protect the health and safety of its people, if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available." (Emphasis added.)

In *Polar Ice Cream and Creamery Co. v. Andrews,* 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed. 2d 389 (1964), the Court had before it a Florida statute requiring a Pensacola distributor to accept its total supply of Class I milk from Florida producers at a fixed price so long as such producers had such milk avail-

able. The Court, speaking through Mr. Justice White, held the statute violated the Commerce Clause, saying:

"The principles of *Baldwin* are as sound today as they were when announced. They justify, indeed require, invalidation as a burden on interstate commerce of that part of the Florida regulatory scheme which reserves to its local producers a substantial share of the Florida milk market.

"Under the controls challenged here, Polar must buy from its Florida producers, and pay 61 cents per gallon for it, an amount of raw milk equal to its Class I sales if it is available from these producers. * * *

"The exclusion of foreign milk from a major portion of the Florida market cannot be justified as an economic measure to protect the welfare of Florida dairy farmers or as a health measure designed to insure the existence of a wholesome supply of milk. This much *Baldwin* and *Dean* made clear. * * * Florida has no power to prohibit the introduction within her territory of milk of wholesome quality acquired [in another State], whether at high prices or at low ones, 294 U.S. 521; the State may not, in the sole interest of promoting the economic welfare of its dairy farmers, insulate the Florida milk industry from competition from other States.

"Florida, it is true, does not prevent distributors located in other States from selling wholesome fluid milk in the Florida market. But allowing competition on the distributor level is no justification for barring interstate milk from the most lucrative segment of Florida's raw milk market. Given such distributor competition as there is, there is still milk in other States which Polar can and wants to acquire and which it will not acquire in the face of the Florida regulations. The burden on commerce and the embargo on out-of-state milk remain. * * *

"The power which we deny to Florida is reserved to Congress under the Commerce Clause, and we are offered nothing indicating either congressional consent to, or acquiescence, in, a regulatory scheme such as Florida has employed."

[3] Quite clearly, there is, at least, serious doubt that G.S. 106-266.8, if construed to authorize the Commission to require

the distributor of milk, "reconstituted" from Wisconsin milk powder, to make compensatory payments to North Carolina milk producers, can be reconciled with the Commerce Clause of the Constitution of the United States.

A reasonable, indeed the more reasonable, construction of G.S. 106-266.8 is that no such power was intended to be conferred upon the Commission by the statute. The order of the Commission does not fix the price which Arcadia pays to its supplier of milk powder, or to its supplier of raw milk, nor does it fix the price for which Arcadia sells its "reconstituted" milk. In Webster's International Dictionary, 2d Ed., "price" is defined as follows:

> "In the broadest sense, the quantity of one thing that is exchanged or demanded in barter or sale for another; the exchange value of one thing expressed in terms of units of another thing; in the narrower and more common sense, the amount of money given, or set as the amount that will be given or received, in exchange for anything; * * * the terms or consideration for the sake of which something is done or undertaken. * * * The cost at which something is obtained. * * * "

Arcadia obtains nothing in return for the payment it is required to make by the order of the Commission. It is required to make such payment to its competitor distributors from whom it elected to purchase nothing, for the benefit of producers from whom it purchased nothing. Likewise, the Commission, by this order, has not undertaken to supervise or regulate the processing of "reconstituted" milk or its sale. Its order has nothing whatever to do with the selection of the ingredients which go into Arcadia's "reconstituted" milk and nothing whatever to do with Arcadia's method of processing such milk. The order leaves Arcadia free to sell its "reconstituted" milk. There is no contention that such milk is not wholesome, that Arcadia is representing it to its customers as anything other than that which it is, or that Arcadia, in the sale of its "reconstituted" milk is engaged in unlawful price cutting or other unfair trade practices. The sole purpose and effect of the Commission's order is to require Arcadia to pay to its competitors, for the benefit of producers with whom Arcadia has no dealings, an amount equal to the difference between the price those producers receive for the milk delivered to those distributors and the price

In re Dairy Farms

they would have received for such milk had Arcadia purchased from those distributors the milk sold to them by those producers.

We note, in passing, that if Arcadia, instead of distributing "reconstituted" milk, made from Wisconsin powder and North Carolina water, had elected to expand its own dairy herd and to distribute the natural milk derived therefrom, the effect on other producers supplying the Asheville area would have been the same. By the express language of G.S. 106-266.8(3) the Commission could not restrict Arcadia's right to do so. We find in the statute no indication of a legislative intent to empower the Commission to afford to other producers greater protection against competition from wholesome "reconstituted" milk.

To interpret G.S. 106-266.8 as conferring upon the Commission power to require a distributor of "reconstituted" milk to make such payments for the benefit of producers, with whom it has no dealings, would also give rise to serious doubt as to whether such exaction would be a violation of Article I, § 19, of the Constitution of North Carolina, which provides, "No person shall be * * * in any manner deprived of his * * * property, but by the law of the land." In *Insurance Co. v. Johnson, Commissioner of Revenue*, 257 N.C. 367, 126 S.E. 2d 92 (1962), this Court held that a tax levied upon fire and lightning insurance premiums to establish a pension fund for firemen was invalid for the reason that it was a tax imposed exclusively upon a particular group of insurance companies for the special benefit of a particular group of public employees. This Court quoted Mr. Justice Roberts, who said in *United States v. Butler*, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed 477 (1936), "The word [tax] has never been thought to connote the expropriation of money from one group for the benefit of another." In this respect, there is no distinction between a tax and the payment required by the order of the Commission.

[4] The provision in G.S. 106-266.9 that "the Commission may prohibit such practices as it may deem to be contrary to the welfare of the public and the dairy industry, such as the use of special prices or special inducements in any form or any unfair trade practices in order to vary from the established prices," may not, in our opinion, be fairly construed to authorize the order here in question. We construe that provision to apply only to the pricing of milk and practices designed to bring about variations from the prices fixed by the Commis-

sion. If not so limited in its application, this provision raises serious doubts as to its constitutionality, since it would appear to confer upon the Commission unbridled discretion to determine what practices it may deem to be contrary to the welfare of the public.

We, therefore, hold that Amendment 27 to Milk Order #2, insofar as it requires Arcadia to make the specified payments into the equalization fund set up by the Commission, is in excess of the statutory authority of the Commission and is void. The judgment of the Superior Court is, therefore, reversed, and this matter is remanded to the Superior Court for the entry by it of a judgment directing the custodians of the funds now held in escrow, as above stated, to repay those funds to Arcadia.

Reversed and remanded.