## STATE v. LOUISE B. WILLIAMS.

(Filed 23 November, 1960.)

**1. Schools § 4a—**

The State Board of Education is given the power to supervise and administer the public school system of the State, Constitution of North Carolina, Art. IX, sections 1 and 9, but it has only that authority over private schools as may be conferred by statute in the valid exercise of the police power.

**2. Schools § 1—**

Private schools have vested property and occupational rights which may not be arbitrarily denied or infringed, and the State may regulate private schools only to the extent that the interest of the health, morals or safety of the public generally manifestly require. Such regulations

may not be arbitrary, discriminatory, oppressive or unreasonable, and the statute delegating the regulatory power must provide adequate legislative standards to guide the administrative body.

**3. Same: Constitutional Law § 20—**

Regulations governing the operation of private schools must apply equally to those within and those outside the State.

**4. Constitutional Law §§ 12, 17—**

The term "liberty" as used in the Fourteenth Amendment to the Constitution of the United States embraces not only freedom from unlawful restraint, but protects, among other liberties, the right to engage in the common occupations of life subject only to those controls which appear compellingly necessary in the interest of the public health, safety or morals.

**5. Constitutional Law § 7—**

While the General Assembly may delegate the power to find facts upon which the operation of a law is made to depend, it may not delegate to an agency or administrative board the power to apply or withhold the application of the law in its absolute or unguided discretion.

**6. Same: Constitutional Law § 24: Schools § 1—**

G.S. 115-253 requiring persons soliciting students for private schools to obtain a license from the State Board of Education so that the State Board may control and supervise the equipment, curricula and instructional personnel of such schools, is unconstitutional as an unwarranted delegation of the law making power, since the statute prescribes no standards to guide the administrative board in granting or withholding the prescribed license. The conviction of a person under the Act must be set aside as a violation of the "Law of the land" clause of the Constitution of North Carolina, Art I, § 17.

**7. Criminal Law § 121—**

A motion in arrest of judgment may be allowed only for defects which appear upon the face of the record proper, and defects which appear only by aid of evidence cannot be the subject of a motion in arrest of judgment.

**8. Same: Constitutional Law § 27—**

In this prosecution for soliciting students for a private school without a license, G.S. 115-253, the fact that defendant was soliciting students for an out of state school appeared only upon the evidence, and therefore the question whether the statute violates the commerce clause of the Federal Constitution is not presented by a motion in arrest of judgment, but it would seem that the statute, insofar as it attempts to regulate solicitors for out of state schools, is a burden on interstate commerce and is unconstitutional.

APPEAL from *Paul J.,* June 1960 Term, of CRAVEN.

This is a criminal action. The bill of indictment charges that Louise B. Williams on 16 January 1960 unlawfully and wilfully

did solicit students, to wit, Allegro Bryant and others, for a correspondence school, without a license.

Plea: not guilty. Verdict: guilty. Judgment: fine and costs. Defendant appeals.

*Attorney General Bruton and Assistant Attorney General Hooper for the State.*

*A. D. Ward for defendant, appellant.*

MOORE, J. Defendant is indicted pursuant to the provisions of G.S. 115-253. This section is a part of Article 31, Chapter 115, of the General Statutes of North Carolina, which provides for the regulation of business, trade and correspondence schools — private schools. The first seven sections of the Article deal, almost entirely, with the regulation of such schools located in North Carolina. G.S. 115-253 requires persons soliciting students within the State for schools "located within or without the State" to secure a license annually from the State Board of Education. The license fee is $5.00. When application is made for a license by a solicitor certain information must be furnished with the application. If the Board approves the instructional program and the solicitor, license will be issued. If license is issued to a solicitor for an out-of-state school, the solicitor shall execute and file a bond in each county in which students are solicited. Nonresident schools employing solicitors shall be responsible for the acts, representations and contracts made by their solicitors. "Any person soliciting students for any such school without first having secured a license from the State Board of Education and without having executed the bond . . . shall be guilty of a misdemeanor . . ." G.S. 115-252 imposes the duty on out-of-state schools to see that their solicitors are licensed and bonded. G.S. 115-254 provides that contracts, notes and evidences of debt obtained by unlicensed solicitors shall be null and void.

Allegro Bryant, a high school teacher, resident of Craven County, received through the mail a card addressed to box holder. The card had been placed in the mail by Citizens Training Service, Inc., a Virginia corporation, having its principle office and place of business in Danville, Virginia. It conducts a correspondence school for preparation for civil service careers — federal, state and municipal. Bryant mailed the card to the school indicating an interest in certain courses. She promptly received certain forms to be held by her until a canvasser called. On 16 January 1960 defendant contacted her and, as a consequence, she signed a contract for instruction de-

signed to prepare her to take examinations for civil service employment as teacher, social worker and junior professional assistant. The fee for the course was $135.00. Bryant paid $20.00 in cash and signed a promissory note for $115.00, to be due 25 February 1960. The contract, according to its terms, was not to be complete until accepted at the business office in Danville. Bryant testified that defendant represented to her that a job was guaranteed. The written contract is to the contrary. Bryant received by mail a book containing 25 or more lessons. She completed and sent in only one assignment. She made no payment on the note. Defendant was not licensed or bonded under the provisions of G.S. 115-253.

Defendant's testimony clearly states her position in this case: "My plea of not guilty and my defense in this prosecution is based solely on the grounds that the provisions of G.S. 115-253 are unconstitutional. If the provisions of this statute are constitutional, I am guilty of violating such provisions of the statute. Otherwise I am not."

Defendant moved to set aside the verdict and for arrest of judgment on the ground that G.S. 115-253 violates Article I, sections 1, 17 and 31 of the Constitution of North Carolina and Article I, section 8, clause 3 of the Constitution of the United States.

The primary purpose of Article 31, of which the challenged section is a part, is to control and regulate certain private schools — specifically business, trade and correspondence schools. The article is entitled, "Business, Trade and Correspondence Schools." As an incident to such control, G.S. 115-253 undertakes to regulate solicitors and canvassers for such schools. It seems clear that the provision for regulation of solicitors is to enable the State Board of Education to indirectly extend its control and supervision to correspondence schools located beyond the borders of the state that solicit and instruct students in North Carolina.

Article 31 assigns the following reasons for imposing regulations on the specified schools: ". . . to protect the public welfare by having the licensed business, trade, or correspondence schools maintain proper school quarters, equipment, and teaching staff and to have the school carry out its advertised promises and contracts made with its students and patrons." G.S. 115-249. In short, it is the intent of the enactment that the State Board of Education pass upon the adequacy of the equipment, curricula and instructional personnel of the schools and protect students from fraud and breach of contract on the part of the schools and their agents and representatives.

The Constitution of North Carolina provides that "schools and

means of education shall forever be encouraged." Art. IX, s. 1. Further, the State Board of Education shall have the power and duty "generally to supervise and, administer the free *public* school system of the State and make all needful rules and regulations in relation thereto." (Emphasis added.) Art. IX, s. 9. The constitutional authority of the State Board of Education to make regulations for and supervise and administer schools is confined to *public* schools and activities substantially affecting public schools and the public school system. It may have and exert only such authority in the supervision and control of private schools and their agents and, representatives as is conferred by the General Assembly in the proper exercise of the police power of the State.

"While the Legislature, under the police power, may regulate education in many respects in private schools, the exercise of such power of regulation must not be arbitrary, and must be limited to the preservation of the public safety, the public health, or the public morals." 47 Am. Jur., Schools, s. 221, p. 459. *Trust Co. v. Lincoln Institute,* (Ky. 1910) 129 S.W. 113, 29 L.R.A. (N.S.) 53, deals with a state statute making the right to establish a private industrial school in a county depend upon a vote of the electors of the county. There it is said: ". . . (U)nless it can be shown that the establishment of such an institution as the one under consideration is in some way inimical to the public safety, the public health, or the public morals, the act which forbids its operation is an exercise of arbitrary power. In other words, the act in question must find its justification in the police power of the state, or it must be declared invalid." In another case it has been declared: "The capacity to impart instruction to others is given by the Almighty for beneficent purposes and its use may not be forbidden or interfered with by government — certainly not, unless such instruction is, in its nature, harmful to the public morals or imperils the public safety." *Farrington v. Tokushige,* (CCA9C 1926) 11 F. 2d 710, 713, quoting *Harlan, J.,* in *Berea College v. Kentucky,* 211 U.S. 45. Private schools have vested property and occupational rights which may not be arbitrarily infringed. *Pierce v. Society of Sisters,* 268 U.S. 510, 39 A.L.R. 468; *Farrington v. Tokushige, supra.*

The State has the power and authority to establish minimum standards for, and to regulate in a reasonable manner, private schools giving instruction to children of compulsory school age. This is necessarily true because such schools affect the public school system. In this connection it has authority, among others, "to inspect, supervise, and examine them, their teachers, and, pupils; to require that

all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught that is manifestly inimical to the public welfare." *Pierce v. Society of Sisters, supra.*

The courts stress the proposition that the regulation of private schools under the police power of the state must be reasonable and in response to a manifest present public need or emergency.

The Court of Appeals of Maryland, in *Schneider v. Pullen* (1951) 81 A. 2d 226, upheld the constitutionality of a statute providing for the regulation of certain private schools, including trade schools. The case involved a barber school. It is suggested that the regulatory act was necessary "because many mushroom schools of various characters sprang up in order to take advantage of government subsidies given to veterans of World War II." The New York Supreme Court held constitutional a statute which provided that private schools be licensed, and that no license should issue if it appeared that the instruction to be given included the doctrine that organized government should be overthrown by force, violence or unlawful means. *People v. Socialist Society,* (1922) 195 N.Y.S. 801. The Court declared: "There can be little question but that it is within the power of the Legislature to enact statutes for the self-preservation of the state, and to prevent the teaching of doctrine advocating the destruction of the state by force . . . (I)t seems to us that the act in question is well within the proper exercise of the police power of the state, and that for the purpose of protecting the peace, public safety, and security of the citizens of the state the Legislature had the right to enact the statute."

On the other hand, the courts have stricken down as unconstitutional many legislative enactments affecting, or seeking to restrict or regulate, private schools, for want of any manifest need therefor by reason of the public morals, health, peace, safety or security, or because of the arbitrary and unreasonable character of the regulation. Instances are: Provision that certain trade schools may not be established in a county without a favorable vote of the electors. *Trust Co. v. Lincoln Institute, supra.* Requirement that all children of specified ages attend public schools. *Pierce v. Society of Sisters, supra.* Prohibition against teaching other than the English language to children below the ninth grade. *Meyer v. Nebraska,* 262 U.S. 390, 29 A.L.R. 1446. Requisite for issuance of license to trade school that its tuition charge be approved by Commissioner of Education. *Grow System School v. Regents,* 98 N.Y.S. 2d 834. Compre-

hensive regulation of private foreign language schools and, among other things, limiting school session to one hour per day. *Farrington v. Tokushige, supra.*

A New York statute provided that no private nursery, kindergarten or elementary schools should be established or maintained unless registered under regulations prescribed by the Board of Regents of the University of the State. The act was declared unconstitutional. *Packer Collegiate Institute v. University,* (1948) 81 N.E. 2d 80. The Court explained the holding: "Private schools have a constitutional right to exist, and parents have a constitutional right to send their children to such schools. (Citing *Pierce v. Society of Sisters, supra.*) The Legislature, under the police power, has a limited right to regulate such schools in the public interest. (Citing authorities.) Such being the fundamental law of the subject, it would be intolerable for the Legislature to hand over to any official or group of officials, an unlimited, unrestrained, undefined power to make such regulations as he or they shall desire, and to grant or refuse licenses to such schools, depending on their compliance with such regulations."

The term "liberty" as used in the Fourteenth Amendment to the Constitution of the United States "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness of free men. (Authorities cited.) The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect. Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts." *Meyer v. Nebraska, supra.*

The statute specifically challenged on this appeal involves the regulation of solicitors for private schools. As already stated, it is our opinion that the legislation (Article 31, Chapter 115) is primarily directed to the schools themselves, and the regulation of their agents and representatives is for the purpose of indirectly supervising out-of-state schools. Hence, we have deemed it proper to discuss at length the principles to be applied in determining whether or not legislative regulation of private schools is within proper limits. These principles in general application apply with equal force and substantially in

like manner to regulation of ordinary occupations — including that of solicitors and salesmen.

"The right to work and earn a livelihood is a property right that may not be denied except under the police power of the State in the public interest for reasons of health, safety, morals or public welfare. Arbitrary interference with private business and unnecessary restrictions upon lawful occupations are not within the police power of the State. Restrictions and regulatory standards may not be applied so as to prevent individuals from freely engaging in ordinary trades and occupations in which men have immemorially engaged as a matter of common right." *State v. Warren,* 252 N.C. 690, 693, 114 S.E. 2d 660.

Beyond all question the State may exercise its police power to regulate salesmen in the public interest. But the regulations must be clearly necessary to protect a substantial public interest and must be reasonable and nondiscriminatory.

The class of salesmen most often regulated is peddlers. Statutes and ordinances requiring those who hawk and peddle from door to door to be licensed have been held constitutional. *People v. Russell,* 14 N.W. 568. "From early times, in England and America, there have been statutes regulating the occupation of itinerant peddlers, requiring them to obtain licenses to practice their trade." *Emert v. Missouri,* 156 U.S. 296. Licensing requirements for clock peddlers have been upheld. *Commonwealth v. Harmel,* (Penn. 1895) 30 A. 1036. In upholding such regulations the courts are careful to explain the need for the legislation. It is stated that peddlers often have no fixed places of abode and no established business site. They are here today and gone tomorrow. The regulations seek to protect the public against cheats, frauds and even thievery which often attends the activities of peddlers. Though there are significant exceptions, their goods are generally inferior in quality and exorbitant in price. Peddlers are generally strangers to their customers. Thus, the courts emphasize need for regulation. The regulatory statutes usually contain, in preamble, a full statement of the purpose and necessity for regulation.

It is impossible to catalog here all types of salesmen whose activities have been constitutionally regulated. A few will suffice. Salesmen of securities have been required to obtain licenses and give bond. *State v. Minge,* (Fla. 1935) 160 S. 670. Licenses have been required of those who sell farm produce on commission, except sales to ultimate consumer. *State v. Mohler,* (Kan. 1916) 158 P. 408. In New York, merchants have been required to obtain license before con-

ducting "going out of business" sales. *Windsor Madison Corp. v. O'Connell,* (1958) 172 N.Y.S. 2d 198. But the regulations for salesmen must be no more drastic than is reasonable to accomplish the end for which the law was adopted. *People v. Windsor Madison Corp.,* (1958) 173 N.Y.S. 2d 964.

In summary, the state has a limited right, under the police power, to regulate private schools and their agents and solicitors, provided: (1) there is a manifest present need which affects the health, morals, or safety of the public generally, (2) the regulations are not arbitrary, discriminatory, oppressive or otherwise unreasonable, and (3) adequate legislative standards are established. *State v. Warren, supra; State v. Harris,* 216 N.C. 746, 6 S.E. 2d 854.

The showing of need, in the instant case, is meager at best. In G.S. 115-249 it is declared, with reference to the supervision of the specified schools by the State Board of Education: ". . . (T)he object of said supervision being to protect the public welfare by having the licensed business, trade, or correspondence schools maintain proper school quarters, equipment, and teaching staff and to have the school carry out its advertised promises and contracts made with its students and patrons." This is the only statement of purpose or need which appears. The need is not declared but, if any exists, must be inferred. For the most part the curricula of the schools sought to be regulated are outside the scope and purpose of instruction given in public schools, colleges and universities. It does not appear, nor is there any publicly accepted thesis known to us, that the instruction by such schools is inadequate in the areas of learning in which they profess to teach. The law proposes to protect students from fraudulent practices and breaches of contract. If fraud exists in this field, it does not appear that it is widespread and affects a large segment of the population. Besides, no special legislation is necessary for this purpose. The courts of this State are open at all times to redress such wrongs, under laws and procedures long established. However, our decision does not rest upon the lack of public need for the regulation. "The Legislative Department is the judge, within reasonable limits, of what the public welfare requires. . . ." *State v. Warren,* 252 N.C. 690, 696, 114 S.E. 2d 660. But it should be remembered that, though the schools involved are not of equal dignity with many old and revered private institutions of learning in our State, the same law applies to all. The principles the Legislature may follow in regulating one, it may apply to all. Standardization and regimentation in the field of learning is contrary to the American concept of individual liberty. It would be difficult to over-estimate

the contribution of private institutions of learning to the initiative, progress and individualism of our people. Regulation should never be resorted to unless the need is compellingly apparent.

G.S. 115-253 contains the following provisions: "When application is made for such license by a solicitor he shall submit to said Board (State Board of Education) for its approval a copy of each type of contract offered prospective students and used by his said school, together with such advertising material and other representations as are made by said school to its students or prospective students, and such instructional material as requested by the Board to enable it to evaluate the instructional program, as well as the sales methods. If the Board approves the instructional program and the solicitor, it shall issue to the solicitor a license . . ." The Legislature has set no standards for evaluating the contract, advertising material or instructional program. Furthermore, no test or rule of any kind has been established for determining the fitness of the solicitor. All of these matters are left to the unlimited discretion of the administrative body — a body which, most likely, has little familiarity with the operation of schools of this type. Such unlimited delegation of authority is beyond the bounds of valid legislation.

*Harvell v. Scheidt,* 249 N.C. 699, 107 S.E. 2d 549, is concerned with the matter of delegation of legislative authority. The Legislature had undertaken to delegate to the Department of Motor Vehicles the authority to suspend the license of an operator or chauffeur without preliminary hearing upon evidence that the licensee was an habitual violator of the traffic laws. The statute did not define the term "habitual violator," set no standards for making the determination, and left the matter to the unlimited discretion of the Department. *Denny, J.,* in delivering the opinion reviewed the holdings of this Court in former cases, cited authorities from other jurisdictions, and concluded: " . . . '(W)hile the Legislature may delegate the power to find facts or to determine the existence or nonexistence of a factual situation or condition on which the operation of the law is made to depend . . . , it cannot vest in a subordinate agency the power to apply or withhold the application of the law in its absolute or unguided discretion, . . .' . . . G.S. 20-16(a)(5) does not contain any fixed standard or guide to which the Department must conform in order to determine whether or not a driver is an habitual violator of the traffic laws. But, on the contrary, the statute leaves it to the sole discretion of the Commissioner of the Department to determine when a driver is an habitual violator of such laws. This we hold to be an unconstitutional grant of legislative power."

*Packer Collegiate Institute v. University, supra,* deals with a statute of the State of New York providing that no private nursery, kindergarten or elementary school might be established or maintained without a certificate of registration under regulations prescribed by the Board of Regents of the University. On the question of legislative standards, the Court concluded: "The quoted statute is, we think, patently unconstitutional as being an attempted delegation of legislative power. . . . The statute before us is nothing less than an attempt to empower an administrative officer . . . to register and license, or refuse to register and license, private schools, under regulations to be adopted by him, with no standards or limitations of any sort. . . . (T)here must be a clearly delimited field of action and, also, standards for action therein. . . . This is not really a question of what powers of control over private schools may validly be delegated by the Legislature. It is here impossible to discover what authority was intended to be turned over. . . . (T)he statute's validity must be judged not by what has been done under it but by what is possible under it." These quotations from the *Packer* case aptly state the principles applicable to the case at bar.

G.S. 115-253 is clearly an unwarranted delegation of legislative power, and defendant's conviction and punishment under the criminal provisions thereof violate the "law of the land" section of the Constitution of North Carolina. Art. I, s. 17.

This appeal does not properly raise the question as to whether or not the statute violates the Commerce clause of the Constitution of the United States. Art. I, s. 8, cl. 5. The bill of indictment does not disclose that defendant was solicitor for an out-of-state school; this fact appears only from the evidence: "A motion in arrest of judgment can be based only on matters which appear on the face of the record proper. . . . The evidence in a case is no part of the record proper." *State v. Gaston,* 236 N.C. 499, 501, 73 S.E. 2d 311. "For the motion to be sustained it must appear that the Court is without jurisdiction, or that the record is in some respect fatally defective and insufficient to support a judgment." *State v. Doughtie,* 238 N.C. 228, 231, 77 S.E. 2d 642. Defects which appear only by aid of evidence cannot be the subject of a motion in arrest of judgment; such defects are brought into question only by motion for nonsuit or motion for directed verdict. *State v. Gaston, supra.*

However, it might be well to point out that it appears settled that statutes such as G.S. 115-253, insofar as they attempt to regulate solicitors for nonresident schools, burden interstate commerce

and are unconstitutional. *State v. Mobley,* 234 N.C. 55, 66 S.E. 2d 12; *Cleaner, Inc. v. Stone,* 342 U.S. 389; *Nippert v. City of Richmond,* 327 U.S. 416; *Text-Book Co. v. Pigg,* 217 U.S. 91, 27 L.R.A. (N.S.) 403; *Robbins v. Taxing District,* 120 U.S. 489; *School of Commerce v. Gross,* 47 N.Y.S. 2d 521, aff'd. by Ct. of App., 55 N.E. 2d 372; *Sackman v. Iosue,* 36 N.Y.S. 2d 625; *Merriman v. Harter,* 280 P. 2d 1045; Anno. 26 A.L.R. 360-1; 11 Am. Jur., Commerce, ss. 45, 46, pp. 44-5.

Reversed.