NOVA UNIVERSITY v. THE BOARD OF GOVERNORS OF THE UNIVERSITY
OF NORTH CAROLINA[1]

No. 110A81

(Filed 3 March 1982)

**Colleges and Universities § 2— Florida institution—teaching program in N.C.—degrees granted in Florida—no right of U.N.C. Board of Governors to regulate**

    The Board of Governors of the University of North Carolina is not authorized by G.S. 116-15 to regulate through a licensing procedure teaching in North Carolina by Nova University when the teaching leads to Nova's conferral of academic degrees in Florida pursuant to Florida law.

    Justice MITCHELL did not participate in the consideration or decision of this case.

    Justice CARLTON dissenting.

    Justice COPELAND joins in this dissent.

ON defendants' petition for discretionary review under General Statute 7A-31(a) of a Court of Appeals' decision[2] reversing the denial of plaintiff's motion for summary judgment by *Judge Hamilton Hobgood* on 15 October 1979 in WAKE Superior Court. This case was argued as No. 51, Spring Term 1981.

*Powe, Porter and Alphin, by E. K. Powe and Charles R. Holton; Glassie, Pewett, Dudley, Beebe and Shanks, by Hershel Shanks and Michael A. Gordon, for plaintiff Nova University.*

*Rufus L. Edmisten, Attorney General, by Elizabeth C. Bunting and Marvin Schiller, Assistant Attorneys General, for defendant Board of Governors.*

1. Individual members of the University's Board of Governors, the University itself, and Mr. William Friday, President of the University, have also been named as defendants. Because this litigation is essentially between Nova University and The University of North Carolina's Board of Governors, and because of our disposition of the case, we think it unnecessary formally to list these parties in the caption of the case.

2. 47 N.C. App. 638, 267 S.E. 2d 596 (1980). The opinion is by Judge Webb with Judges Parker and Clark concurring. We allowed defendants' petition on 16 September 1980, 301 N.C. 94, 273 S.E. 2d 299.

EXUM, Justice.

The question dispositive of this litigation is whether General Statute 116-15[3] authorizes the Board of Governors of the University of North Carolina (herein "Board") to regulate through a licensing procedure teaching in North Carolina by Nova University (herein "Nova") when the teaching leads to Nova's conferral of academic degrees in Florida and pursuant to Florida law. The Court of Appeals concluded that the statute contains no such authorization. We agree and affirm.

Defendant Board, acting under G.S. 116-15 and various regulations adopted by it pursuant to the statute, denied plaintiff Nova, a Florida nonprofit corporation, a license to teach in North Carolina curricula designed by Nova to lead to its conferral in Florida of certain academic degrees. Nova has challenged this ruling by filing in superior court what it denominates a "Petition and Complaint." Its petition is filed pursuant to G.S. 150A-45, the section of our Administrative Procedure Act (herein "APA") which provides that "judicial review of a final agency decision" may be obtained through "a petition" filed in Wake Superior Court. By its complaint, or civil action, Nova seeks both a declaratory judgment that the Board has no authority to license its teaching in North Carolina or its conferral of degrees in Florida under Florida law and injunctive relief against the Board's attempt at this kind of regulation. In superior court Nova filed both a motion for summary judgment and a motion for extension of time to conduct discovery. Both motions appear to be related to Nova's civil action, rather than its APA petition for review; but the Board resisted only Nova's motion to extend time for discovery on the ground that Nova's relief, if any, from the Board's decision was via its APA petition for review. The Board argued that the superior court could not entertain a separate civil action and Nova had no right to discovery in a proceeding to review an administrative decision.

Judge Hobgood, after a hearing, denied Nova's motion for summary judgment "without prejudice" to Nova's having its "appeal from an adverse ruling of an administrative agency heard pursuant to [the APA]." Concluding, however, that Nova had a

---

3. Pertinent provisions of the statute are set out, *infra*, in text.

right to conduct discovery, Judge Hobgood allowed Nova's motion to extend time for discovery.

The Court of Appeals allowed both Nova's and the Board's petitions for certiorari, each party having sought review of the ruling adverse to it. The Court of Appeals, after concluding that under G.S. 116-15 the Board "does not have the power to license or regulate Nova University in its teaching program in this state so long as Nova does not confer degrees in this state," reversed Judge Hobgood's denial of Nova's summary judgment motion and remanded for entry of a judgment consistent with its opinion. The Court of Appeals did not, therefore, reach the discovery question raised by the Board's petition for certiorari.

Before us the Board has not sought to sustain the denial of Nova's summary judgment motion on the ground that the superior court had no jurisdiction to entertain it. It continues to argue that Nova's exclusive judicial remedy is under the APA only as a challenge to the superior court's ruling on Nova's discovery motion. Both parties have before us treated the case as if Nova's motion for summary judgment was procedurally a proper way to raise the question of the Board's authority to act. Both have vigorously and ably argued this question here and in the Court of Appeals on the basis that a conclusion that the Board lacked such authority would effectively terminate the litigation in Nova's favor whether the matter is considered as a petition under the APA or civil action against the Board, or both. We approach this aspect of the case as have the parties.

We now proceed to the question at hand.

General Statute 116-15 provides:

"Licensing of nonpublic educational institutions; regulation of degrees. — (a) *No nonpublic educational institution created or established in this State after December 31, 1960,[4] by any*

---

4. The date of "December 31, 1960," both here and in sub-section (b), was substituted for "April 15, 1923" by Act of June 14, 1977, ch. 563, §§ 1 & 2, 1977 N.C. Sess. Laws 665 (1st Sess.). According to the Board's brief, which is supported by the record, this updating of the grandfather clause was suggested to the 1977 General Assembly by Dr. Cameron West, then President of the North Carolina Association of Independent Colleges and Universities, in order to remove from the Board's regulatory power four private North Carolina institutions, Methodist Col-

Nova University v. The Board of Governors

*person, firm, organization, or corporation shall have power or authority to confer degrees upon any person except as provided in this section.* For the purposes of this section, the term 'created or established in this State' or 'established in this State' shall mean, in the case of an institution whose principal office is located outside of North Carolina, the act of issuance by the Secretary of State of North Carolina of a certificate of authority to do business in North Carolina.[5] The Board of Governors shall call to the attention of the Attorney General, for such action as he may deem appropriate any institution failing to comply with the requirements of this section.

(b) *The Board of Governors, under such standards as it shall establish, may issue its license to confer degrees in such form as it may prescribe to a nonpublic educational institution established in this State after December 31, 1960,* by any person, firm, organization, or corporation; but no nonpublic educational institution established in the State subsequent to that date shall be empowered to confer degrees unless it has income sufficient to maintain an adequate faculty and equipment sufficient to provide adequate means of instruction in the arts and sciences, or in any other recognized field or fields of learning or knowledge.

(c) All nonpublic educational institutions licensed under this section shall file such information with the President as the Board of Governors may direct, and the said Board may evaluate any nonpublic educational institution applying for a license to confer degrees under this section. If any such nonpublic educational institution shall fail to maintain the required standards, the Board shall *revoke its license to confer degrees,* subject to a right of review of this decision in the manner provided in Chapter 150A of the General Statutes." (Emphasis supplied.)

---

lege, Mount Olive College, North Carolina Wesleyan College and St. Andrews Presbyterian College, "which were established after April 15, 1923, but which had enjoyed a long and stable tenure in this State and which had academic programs of high quality." Board's brief, p. 5.

5. This sentence was also added by Act of June 14, 1977, ch. 563, *supra,* § 3. Although it does not appear in the record, the parties in oral argument agreed that Nova was certified by the Secretary of State to do business in North Carolina.

Acting pursuant to subsection (b) of the statute, the Board adopted "Rules and Standards for Licensing Non-Public Educational Institutions To Confer Degrees."[6] (Herein "Standards.") These Standards provide for a number of "minimum standards" with which "a non-public degree-granting educational institution operating wholly or in part in North Carolina" must comply. They relate, in part, to "the quality and content of each course or program of instruction"; the adequacy of "space, equipment, instructional materials, and personnel"; the qualifications of administrators and instructors; financial soundness; and absence of discriminatory practices. "Accreditation by the appropriate accrediting agency . . . may be accepted by the Board . . . as evidence of compliance with [the] minimum standards." The Standards then provide for a procedure whereby an institution may apply for a license. After application, an "examination visit" to the applicant institution's campus by a "team of examiners" is conducted. The Team then files its report and recommendations with the President of the University of North Carolina. After opportunity is given to the applicant to discuss and make additions to the report of the examining team, the matter is submitted to the Board for its "decision and final disposition of the institution's request for licensing." The Rules provide for judicial review of the Board's decision pursuant to Article 4 of G.S. 150A.

In addition to its Standards, the Board on 13 February 1976 adopted revised "Guidelines for Interpretation and Implementation" of its Standards (herein "Guidelines"). The Guidelines are expressly designed to "interpret the rules and minimum standards under which the Board . . . issues licenses to non-public educational institutions *to confer degrees in North Carolina.*" (Emphasis supplied.) The Guidelines, after stating the Board's conception of the "broad purpose of higher education," outline in detail requirements for an acceptable "educational program" for each of several types of academic degrees.[7] After stating the Board's conception of the capacities of "[a] generally educated person" and how these capacities are generally developed, the Guidelines provide:

6. According to admissions in the pleadings these rules were first adopted on 8 February 1974, but were later revised on 13 February 1976. It is the revised version of the rules which is pertinent to this case.

7. The Guidelines provide program specifications for the associate and baccalaureate degrees and the master's, intermediate, and doctor's graduate degrees.

*"Extension work Offered by Out-of-State Institutions.* Any institution legally operating in another state that wishes to offer in North Carolina courses leading to a degree is to apply in the same manner *for a license to grant degrees,* and is to be judged by the same standards as institutions applying for initial licensure in North Carolina." (Emphasis supplied.)

The Guidelines close with a section on how an educational institution should be organized and administered.

It is against this legislative and regulatory backdrop that the dispute before us arose.

It is undisputed that Nova is a nonprofit corporation organized and existing under the laws of Florida with its principal place of business in Fort Lauderdale, Florida. In addition to undergraduate, graduate and professional curricula taught at its 200 acre campus in Fort Lauderdale, Nova, beginning in 1972 and thereafter, instituted various "non-resident" curricula designed to lead to the conferral by Nova in Florida of various degrees for professional persons.[8] Candidates for these degrees are not required to fulfill traditional residence requirements at the Nova campus in Fort Lauderdale. Instead, they form "clusters" of 25 to 30 persons who meet regularly at a site in the state where they live. They are taught by professors, most of whom also teach at universities with traditional residency requirements and who are flown in for weekend sessions with the candidates. The candidates listen to lectures, take notes, have class discussions and undergo examinations. In addition, candidates are required to attend summer institutes at Nova's home campus. Courses and research projects required for the degrees usually require three or more years to complete. Successful candidates receive their degrees in Florida by virtue of Nova's charter under the laws of that state. Nova is and has been since 1971 fully accredited by the Southern Association of Colleges and Schools, the officially recognized accrediting association of the southeastern United States. Nova's accreditation was most recently affirmed for a ten-year period after a review in 1974-75 of its educational programs

8. The degrees of concern here are (1) the Doctor of Education Degree for "educational leaders"; (2) the Doctor of Education Degree for "community college faculty"; (3) master's and doctor's degrees in public administration; (4) a master's degree in "criminal justice."

including its extension courses such as those here at issue. Nova offered its first nonresident curriculum leading to the Doctor of Education Degree for community college faculty in North Carolina in the fall of 1973.

According to Nova's complaint, it did not believe that it was subject to the jurisdiction of the Board; but with confidence in the quality of its curriculum and desire to cooperate with North Carolina authorities, it applied to the Board on 19 November 1976 for licensure.

This application was processed according to the Board's Standards and Guidelines. After reviewing documentary material, contacting persons familiar with Nova's curriculum and making site visits both to the North Carolina "clusters" and to the Fort Lauderdale campus, a team of examiners appointed by the Board recommended on 31 October 1977 denial of Nova's license application. This recommendation was seconded by staff personnel of the University of North Carolina; and on 7 December 1978 the Board's Committee on Educational Planning, Policies and Programs recommended that the Board deny Nova's license application. The Board by resolution on 8 December 1978 denied the application. According to the Board's resolution it found that the curriculum leading to the degrees in question lacked "sufficient depth and extensiveness in terms of time and effort required of students," lacked "an adequate faculty in terms of faculty members' contact with and accessibility to their students" and lacked "equipment in terms of libraries and instructional facilities sufficient to provide adequate means of instruction in any of the fields of learning in which" Nova proposed to confer degrees. The Board apparently had no dispute with the qualifications of the faculty generally.

In due time Nova brought this proceeding in Wake Superior Court challenging the Board's action on a multitude of grounds.[9]

---

9. Grounds other than the one discussed in the text are the contentions that if G.S. 116-15 is construed to permit the Board to regulate Nova's teaching in North Carolina, then the statute violates the Interstate Commerce and Free Speech Clauses of the United States Constitution and the Free Speech, Law of the Land, Anti-monopoly and Equal Protection Clauses of the North Carolina Constitution. Nova also argues that G.S. 116-15 is an unconstitutional delegation of authority to the Board because it fails to provide any legislative standards for the Board's exercise of its administrative discretion.

Nova's most compelling argument, and the one with which we agree, is that G.S. 116-15 expressly authorizes the Board to license only the conferral of degrees. The statute, therefore, should not be interpreted beyond its terms to authorize the Board to license teaching even though the teaching is designed to lead to a degree conferral.

The Board argues to the contrary. It agrees that the statute by its terms speaks only of the Board's authority to license degree conferrals. The Board argues, however, that because the statute authorizes the Board to license degree conferrals, the power to license teaching designed to lead to degree conferrals is necessarily implied.

The Court of Appeals answered the Board's argument by stating "[t]he difficulty we have with the Board's position is that the statute does not specifically grant the power it seeks. What they ask is the power to regulate and license Nova's right to teach which is a restriction on freedom of speech. As Nova points out, other constitutional questions would also arise if we interpreted the statute as contended by the Board. We do not believe we should find a power in the statute by implication which could lead to such constitutional problems. If the General Assembly wants to give the Board the power to so restrict teaching in this state, it may do so specifically and the constitutional questions may then be raised. The statute is not clear in giving the Board the power it seeks. We do not believe we should find this power by implication."

We agree essentially with these conclusions. Insofar as the statute is susceptible to two reasonable interpretations, the one proffered by the Board and the other by Nova, the Board is met head-on by the canon of statutory construction that "[w]here one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question shall be adopted." *In re Arthur*, 291 N.C. 640, 642, 231 S.E. 2d 614, 616 (1977); *accord, In re Dairy Farms*, 289 N.C. 456, 223 S.E. 2d 323 (1976); *see also State Education Assistance Authority v. Bank of Statesville*, 276 N.C. 576, 174 S.E. 2d 551 (1970); *North Carolina Milk Commission v. National Food Stores, Inc.*, 270 N.C. 323, 154 S.E. 2d 548 (1967); *City of Randleman v. Hinshaw*, 267 N.C. 136, 147 S.E. 2d 902 (1966).

All that Nova does in North Carolina is teach. Teaching and academic freedom are "special concern[s]" of the First Amendment to the United States Constitution, *Keyishian v. Board of Regents of New York,* 385 U.S. 589, 603 (1967); and the freedom to engage in teaching by individuals and private institutions comes within those liberties protected by the Fourteenth Amendment to the United States Constitution. *Pierce v. Society of Sisters,* 268 U.S. 510 (1925); *Meyer v. Nebraska,* 262 U.S. 390 (1923); *State v. Williams,* 253 N.C. 337, 117 S.E. 2d 444 (1960).

*State v. Williams, supra,* dealt with G.S. 115-253 then a part of Article 31, Chapter 115, of our statutes, which provided generally for the regulation of business, trade and correspondence schools, *i.e.,* certain private schools. The statute in question required persons soliciting students in North Carolina for schools "located within or without the State" to secure a license from the State Board of Education. A representative of a Virginia school solicited a North Carolina high school teacher to take a course of instruction by correspondence from the Virginia school. The representative was prosecuted for the misdemeanor of soliciting the student "without first having secured a license from the State Board of Education" in violation of the statute making such act a crime. She defended on the ground that the statute was unconstitutional. This Court sustained her defense. In a thorough opinion, canvassing the law from both the United States Supreme Court and our sister jurisdictions, this Court held that the state had "a limited right, under the police power, to regulate private schools and their agents and solicitors, provided: (1) there is a manifest present need which affects the health, morals, or safety of the public generally, (2) the regulations are not arbitrary, discriminatory, oppressive or otherwise unreasonable, and (3) adequate legislative standards are established." 253 N.C. at 345, 117 S.E. 2d at 450. Noting that the need in the case before it for regulation was "meager at best," the Court also pointed out, *id.* at 345-46, 117 S.E. 2d at 450:

> "But it should be remembered that, though the schools involved are not of equal dignity with many old and revered private institutions of learning in our State, the same law applies to all. The principles the Legislature may follow in regulating one, it may apply to all. *Standardization and regimentation in the field of learning is contrary to the*

*American concept of individual liberty.* It would be difficult to over-estimate *the contribution of private institutions of learning to the initiative, progress and individualism of our people. Regulation should never be resorted to unless the need is compellingly apparent.*" (Emphasis supplied.)

The Court ultimately concluded that G.S. 115-253 was clearly "an unwarranted delegation of legislative power . . . violat[ing] the 'law of the land' section of the Constitution of North Carolina." *Id.* at 347, 117 S.E. 2d at 451. The Court closed its opinion by saying, "it might be well to point out that it appears settled that statutes such as G.S. 115-253, insofar as they attempt to regulate solicitors for nonresident schools, burden interstate commerce and are unconstitutional (Citations omitted)." *Id.* at 347-48, 117 S.E. 2d at 452.

In *Keyishian v. Board of Regents of New York, supra,* the Supreme Court struck down a New York regulatory scheme designed to prevent the hiring and retention in state employment of "subversive" personnel. Those challenging the regulations in the case were faculty members of the State University of New York. Insofar as the regulations applied to these teachers the Supreme Court had occasion to note, 385 U.S. at 603:

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' *Shelton v. Tucker, supra,* at 487. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.' *United States v. Associated Press,* 52 F Supp 362, 372. In *Sweezy v. New Hampshire,* 354 US 234, 250, we said:

'The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by

those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are acquired as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.' "

Were we, therefore, to interpret G.S. 116-15 as the Board suggests, serious constitutional questions arising under the First Amendment and the Interstate Commerce and Fourteenth Amendment Due Process Clauses of the United States Constitution and the Law of the Land Clause of the North Carolina Constitution would arise.

Further, we do not think the Board's proffered interpretation of G.S. 116-15 is a reasonable one. The Board argues as follows: The legislature has made clear in other provisions of Chapter 116, dealing with higher education in North Carolina, that the Board is to preside over the planning and development of a coordinated system of higher education in this state.[10] In order to accomplish

---

10. The Board notes particularly, the following provisions of Chapter 116:

"§ 116-1. *Purpose.—In order to foster the development of a well-planned and coordinated system of higher* education, to improve the quality of education, to extend its benefits and to encourage an economical use of the State's resources the University of North Carolina is hereby redefined in accordance with the provisions of this Article.

"§ 116-11. *Powers and duties generally.* — The powers and duties of the Board of Governors shall include the following:

(1) *The Board of Governors shall plan and develop a coordinated system of higher education in North Carolina.* To this end it *shall govern the 16 constituent institutions* [defined in G.S. 116-4], subject to the powers and responsibilities given in this Article to the boards of trustees of the institutions, *and* to this end it *shall maintain close liaison with* the State Board of Education, the Department of Community Colleges and the *private colleges and universities of the State. The Board, in consultation with representatives of the State Board of Education and of the private colleges and universities, shall prepare and from time to time revise a long-range plan for a coordinated system of higher education,* supplying copies thereof to the Governor, the members of the General Assembly, the Advisory Budget Commission and the institutions. . . ." (Emphasis supplied.)

this broad legislative purpose the Board argues that it must have the power not only to license degree conferrals, but also the teaching of curricula which lead to such conferrals. Thus, argues the Board, citing *Board of Education v. Dickson,* 235 N.C. 359, 70 S.E. 2d 14 (1952), the meaning of this statute is to be found in what it necessarily implies as much as in what it specifically expresses. The Board reminds us that "[w]e are not at liberty to give a statute a construction at variance with [the legislature's] intent, even though such construction appears to us to make the statute more desirable and free it from constitutional difficulties." *State v. Fulcher,* 294 N.C. 503, 520, 243 S.E. 2d 338, 350 (1978).

It is true that portions of Chapter 116 do purport to give the Board broad powers in the planning and coordination of a system of higher education in North Carolina. These powers of planning and coordination are granted to the Board in a number of subsections of G.S. 116-11, each of which deals with a specific power. These grants of power, however, are expressly relative to the Board's governance of the constituent institutions of the University of North Carolina.[11] Only G.S. 116-15, dealing specifically with the licensing of degree conferrals, purports to give the Board authority over private educational institutions, and even this authority is severely limited by the grandfather clause exempting all institutions established before 31 December 1960.

Neither does the Board need, by implication or otherwise, the power to license teaching leading to degree conferrals apart from and in addition to its power to license those conferrals made by North Carolina colleges and universities in order to accomplish the purpose of the legislation. Although a private North Carolina

---

11. In addition to subsection (1), quoted at n. 10, *supra,* some of the other subsections provide in pertinent part as follows:

"(2) The Board of Governors shall be responsible for the general determination, control, supervision, management and governance of all affairs of *the constituent institutions.*"

"(3) The Board shall determine the functions, educational activities and academic programs of *the constituent institutions.*"

"(6) The Board shall approve the establishment of any new *publicly supported institution* above the community college level."

"(8) The Board shall set enrollment levels of *the constituent institutions.*" (Emphasis supplied.)

educational institution may remain free to teach what it will without the Board's sanction, it cannot, under the statute,[12] grant a degree based on such instruction unless the Board approves. Inherent in the power to license degrees is the power to establish minimum criteria which a North Carolina institution must meet in order to be licensed to grant degrees. This is sufficient power for the Board to ensure that degrees conferred by North Carolina institutions are backed by curricula meeting the minimum standards of quality prescribed by the Board's regulations. We believe it is all the power the legislature intended to confer.[13]

The difficulty, of course, is that the Board cannot regulate Nova's degree conferrals made in Florida under the auspices of Florida law. The Board concedes that it does not have this extraterritorial jurisdiction. Therefore, the Board argues, the power to license teaching conducted by Nova in North Carolina leading to a degree from the Florida institution must necessarily be implied if the Board is properly to guard against the possibility that

---

12. We assume for purposes of argument, but without deciding, that the legislature may constitutionally give the Board the power to license degree conferrals made by North Carolina institutions.

13. We are satisfied that the legislature had in mind only North Carolina institutions when it enacted in 1971 those provisions of G.S. 116-15 now under consideration. In the Act of October 30, 1971, ch. 1244, § 1, 1971 N.C. Sess. Laws (1st Sess.), the legislature spoke of "non-public educational institution[s] created or established in this State" without assigning any meaning to "created or established" other than their ordinary connotation. It was not until 1977, four years after Nova offered its first external program in North Carolina and seven months after it applied for a license, that the legislature amended G.S. 116-15(a) to define the phrase "created or established." It was then that the legislature first mentioned out-of-state institutions in connection with "[l]icensing of nonpublic educational institutions" and "regulation of degrees." The amendment stated: "For the purposes of this section, the term 'created or established in this State' or 'established in this State' shall mean, in the case of an institution whose principal office is located outside of North Carolina, the act of issuance by the Secretary of State of North Carolina of a certificate of authority to do business in North Carolina." Act of June 14, 1977, ch. 563, *supra*, § 3. Thus, it is apparent that the legislature did not even contemplate out-of-state schools like Nova when the licensing provisions of the statute were designed. Even after the 1977 amendment purporting to bring out-of-state institutions within the statute's ambit, the legislature did not broaden the reach of the licensing scheme itself. The Board's power remained limited to the licensing of "degree conferrals." Whether a statute could be constitutionally designed to regulate in-state teaching or even in-state degree conferrals by out-of-state schools operating under the laws of other states is a question not now before us and one which we do not now decide.

this state's citizens will be awarded degrees which are not, in the Board's view, supported by adequate academic preparation.

The Board, however, may not exercise more licensing power over Nova than it has over North Carolina institutions. *State v. Williams, supra,* 253 N.C. at 345, 117 S.E. 2d at 452. Thus, the Board cannot be given authority to license Nova's teaching in North Carolina when it has no authority to license teaching by a North Carolina institution. Since the statute gives the Board' no such authority, either expressly or by necessary implication, to license teaching by North Carolina private institutions, even when such teaching may lead to a degree conferral, it likewise gives the Board no authority to license this kind of teaching on the part of Nova.[14]

Indeed the Board in its Brief concedes, "Nova is free to teach what it . . . wishes to teach, and its students are entitled to learn the same. This remains true even though Nova was denied a license to offer degree programs and confer degrees in this state." If this is true, and we agree that it is, then Nova must, prevail. For, by whatever name it is called, all that Nova does in North Carolina is teach. To say that it is conducting a "degree program" which is somehow different from or more than mere teaching, as the Board would have it, is nothing more than the Board's euphemization. Teaching is teaching and learning is learning notwithstanding what reward might follow either process. The Board's argument that the power to license teaching is necessarily implied from the power to license degree conferrals simply fails to appreciate the large difference, in terms of the state's power to regulate, between the two kinds of activities. The Board accuses Nova of trying to accomplish an "end run" around the statute. In truth, the Board, if we adopted its position, would be guilty of an "end run" around the statutory limits on its licensing authority.

Finally, the Board's proffered canons of statutory construction, including the canon that "[t]he construction of statutes

14. To say, as we do, that the Board has no power under the statute to license teaching, whether by an out-of-state or an in-state institution, is not to say, as the dissenters contend, that the Board has no power to regulate degree conferrals by in-state institutions operating under North Carolina law if they occur outside the state. This again is a question not now before us and one which we do not now decide.

adopted by those who execute and administer them is evidence of what they mean," *Commissioner of Insurance v. Automobile Rate Office*, 294 N.C. 60, 67, 241 S.E. 2d 324, 329 (1978), are designed to help courts construe statutes where the statute is susceptible to construction. When the language of the statute is unambiguous and the meaning clear, there is no room for judicial construction. *Phillips v. Shaw*, 238 N.C. 518, 520, 78 S.E. 2d 314, 315 (1953). "[T]he province of construction lies wholly within the domain of ambiguity, and . . . if the language used is clear and admits but one meaning, the Legislature should be taken to mean what it has plainly expressed." *Asbury v. Town of Albemarle*, 162 N.C. 247, 250, 78 S.E. 146, 148 (1913).

Here the legislature has clearly authorized the Board to license only degree conferrals, not teaching. Because of the statute's clear language limiting the Board's authority to license only degree conferrals and not separately to license the teaching which may lead to the conferral, the statute is simply not reasonably susceptible to a construction which would give the Board the power to license such teaching.

Since this determination effectively ends this litigation, we, like the Court of Appeals, need not reach the question of whether Judge Hobgood erred in granting Nova an extension of time to conduct discovery.

The decision of the Court of Appeals is, for the reasons stated,

Affirmed.

Justice MITCHELL did not participate in the consideration or decision of this case.

Justice CARLTON dissenting.

I respectfully dissent from the majority opinion. Its interpretation of G.S. 116-15 as applying only to the physical conferral in this state of academic degrees emasculates that statute and seriously erodes the power of the Board of Governors in carrying out its statutory mandate to plan and develop a coordinated system of higher education in this state. The law created by the majority would allow any private organization which teaches in

this state to avoid regulation and minimum standards of quality by simply stepping a few feet across the state line on graduation day and handing out diplomas to its North Carolina students. Such a result could not possibly have been the intent of our Legislature. In order to accomplish its statutorily expressed purposes,[1] the Board must have the power to license all degree conferral programs offered within this state, regardless of where the graduation ceremony is held. I believe it does have that power.

I cannot argue with the majority's statement that G.S. 116-15 expressly mentions only the regulation of degree conferrals; our disagreement lies in whether this statute *implicitly* authorizes the licensing or regulation of the programs which lead to degree conferrals. In my opinion, the power to regulate or license degree conferral programs is essential to the power to regulate degree conferral itself and is necessarily implied by the statute. My conclusion is based on two grounds: (1) the language of G.S. 116-15 itself and (2) the purpose and function of the Board of Governors.

(1) In pertinent part, G.S. 116-15 provides:

§ 116-15. Licensing of nonpublic educational institutions; regulation of degrees.—(a) No nonpublic educational institution created or established in this State after December 31, 1960, by any person, firm, organization, or corporation shall have *power or authority to confer degrees* upon any person except as provided in this section.

(b) The Board of Governors, under such standards as it shall establish, may issue its license to confer degrees in such form as it may prescribe to a nonpublic educational institution established in this State after December 31, 1960, by any person, firm, organization, or corporation; but *no nonpublic educational institution established in the State subsequent to that date shall be empowered to confer degrees unless it has income sufficient to maintain an adequate faculty and equipment sufficient to provide adequate means of instruction in the arts and sciences, or in any other recognized field or fields of learning or knowledge.*

1. See G.S. § 116-11 (Supp. 1981).

(c) All nonpublic educational institutions licensed under this section shall file such information with the President as the Board of Governors may direct, and the said Board may evaluate any nonpublic educational institution applying for a license to confer degrees under this section. If any such nonpublic educational institution shall fail to maintain the required standards, the Board shall revoke its license to confer degrees, subject to a right of review of this decision in the manner provided in Chapter 150A of the General Statutes.

(Emphasis added.) From the emphasized portions of this statute it is obvious that the Legislature intended that licensure to confer degrees depend upon "income sufficient to maintain an adequate faculty and equipment sufficient to provide adequate means of instruction" in the fields of knowledge in which a degree is sought. This language clearly evinces a legislative concern over the quality of a program leading to the conferral of a degree. Hence, inherent in the authority to license private entities to confer degrees is the power to license the programs leading to those degrees. To separate the physical act of bestowing a diploma from the program which leads to the degree is to exalt form above substance. The concern of the Legislature that degree programs be sufficiently funded and equipped to provide adequate means of instruction shows that it considered the degree conferral program to be an inherent and inseparable part of the ability and authority to confer degrees.

(2) The purpose of the Board of Governors is to plan and develop a coordinated system of higher education in North Carolina. G.S. § 116-11(1) (Supp. 1981). To this end it is authorized to license private institutions to confer degrees. If the licensing requirement can be met by side-stepping the statute, literally, then the Board of Governors has few means available to accomplish its purposes.

If this loophole exists in G.S. 116-15, all institutions now subject to the licensing requirement and the minimum standards and regulations attendant to it may escape the coverage of the statute by holding their graduation ceremonies just across the state line. It will not matter that their students are North Carolina citizens who are solicited and taught in this state and that their graduates will remain in North Carolina to use their degrees. In truth, these

students will have acquired their knowledge through programs conducted in this state, and those programs, good or bad, will be part of the system of higher education in this state. Under the majority's decision, these institutions will be immune from any licensing requirement and cannot be part of the plan for a coordinated system of higher education. Such an exception, grounded on the geographical location of the graduation ceremony, cannot have been within the legislative intent. Both the language of the licensing statute indicating a concern with the adequate funding and facilities and the statutorily stated purpose of the Board of Governors evince a clear legislative intent that the "power or authority to confer degrees" implicitly includes the power or authority to offer degree conferral curricula within this state. Because the former is expressly required to be licensed, then the latter must also be licensed.

Although the majority makes much of the canon of statutory construction that " '[w]here one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question shall be adopted,' " (quoting *In re Arthur*, 291 N.C. 640, 642, 231 S.E. 2d 614, 616 (1977)), I find it unpersuasive. The intent of the Legislature is the polar star which guides the courts in determining the meaning of a statutory provision. *Underwood v. Howland*, 274 N.C. 473, 164 S.E. 2d 2 (1968). In ascertaining the legislative intent a court should consider the language of the statute, the spirit of the act and what the act seeks to accomplish. *Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972). As stated above, the language, purpose and spirit of the statutory scheme in question, in my opinion, clearly indicate a legislative intent to require that programs leading to degree conferral, and not just the handing out of a diploma, be licensed by the Board of Governors. That this construction of the statute raises numerous constitutional questions is of no consequence: if such is found to be the legislative intent, this Court "[is] not at liberty to give to a statute a construction at variance with [the legislative] intent, even though such construction appears . . . to make the statute more desirable and to free it from constitutional difficulties." *State v. Fulcher*, 294 N.C. 503, 520, 243 S.E. 2d 338, 350 (1978).

The majority's adoption of a literal construction of G.S. 116-15 is premised on the assumption that the interpretations

proffered by Nova and by the Board of Governors are both
reasonable. I submit that the interpretation adopted by the
majority is not reasonable and renders the statutory scheme
devoid of rhyme or reason.

The majority makes much of the distinction between teaching
and the conferral of degrees. According to the majority, Nova
merely teaches within North Carolina. Because teaching is a right
protected by the first amendment, it cannot be regulated. G.S.
116-15 does not purport to regulate mere teaching. Thus, the
majority concludes, because Nova's activities in this state are
confined to teaching, those activities cannot be regulated:

> [B]y whatever name it is called, all that Nova does in North
> Carolina is teach. To say that it is conducting a "degree pro-
> gram" which is somehow different from or more than mere
> teaching, as the Board would have it, is nothing more than
> the Board's euphemization. Teaching is teaching and learning
> is learning notwithstanding what reward might follow either
> process. The Board's argument that the power to license
> teaching is necessarily implied from the power to license
> degree conferrals simply fails to appreciate the large dif-
> ference, in terms of the state's power to regulate, between
> the two kinds of activities.

I must confess that I also fail to appreciate the "large
difference, in terms of the state's power to regulate, between
[teaching and degree conferral]." Assuming, as does the majority,
that the Board constitutionally may license degree conferral by
private institutions within this state, I am at a loss to understand
how the licensing of degree conferrals differs, in practical terms,
from the licensing of the program. In considering whether to
grant a private institution a license to confer degrees, the Board
considers such factors as years in operation, safety and health
standards, maintenance of records, financial soundness, reputation
of officers and staff, admissions policies, adequacy of facilities for
classes and study, adequacy of faculty, and academic quality of
the programs offered. Appellant's Brief, at 11-12. Most of these
factors deal with adequacy of educational resources and the
degree to which the school's environment is conducive to learn-

ing, *not with what is taught or how it is taught*.[2] To the degree that these factors concern the teaching or learning in the case of an institution which confers degrees in North Carolina, they regulate, *to the same extent and no more*, the teaching of degree conferral programs designed to lead to conferral of degrees outside the state. In asserting that Nova is subject to the licensing requirement contained in G.S. 116-15, the Board is attempting to assert *exactly the same* authority it does over institutions operating wholly within this state.

That the Board attempts to evaluate only the ability to teach or opportunity for and sufficiency of learning and not what is taught is reflected in its evaluation of Nova. Nova was found to have satisfied the following criteria:

(1) It was properly chartered and had been in operation for at least two years;

(2) Its safety and health standards were adequate;

(3) Its record-keeping system was adequate;

(4) It was financially sound;

(5) Its officers and staff had good reputation and character;

(6) Its admissions policies were nondiscriminatory.

Deficiencies were found, however, in the requirements of adequate facilities and adequate faculty. Nova was found to have no formal arrangements for facilities in which to hold classes or for access for its students to library facilities. One cluster group was holding its meetings in a motel. The lack of specific arrangments for meeting and library space did not ensure continuity of the program nor did it provide an academic setting conducive to the in-depth study and research required for graduate degrees. Deficiencies were also noted in specific degree programs. These deficiencies concerned mainly the inadequacy of testing, little opportunity for in-depth study, insufficient amount of material, and little opportunity to interact with faculty.

---

2. In its evaluation of Nova, the investigative team did find inadequacies in the amount of material covered. This, however, does not regulate *what* is taught, but sets minimim standards of coverage for degree recognition.

Nova University v. The Board of Governors

I wish to make it clear that I agree that Nova is free to teach anything it wants to teach without a license from the Board of Governors. However, the factor which makes Nova subject to the licensing requirement is that *it does not merely teach*; the programs it offers in this state are advertised and do indeed lead to conferral of a degree. It is not the fact of teaching that makes Nova subject to licensure, it is the offering of a degree program, the promise of a degree.

I freely admit that the construction urged by the Board and which I find persuasive is not free from constitutional difficulties. Those presented to us are infringement on freedom of speech, violation of the commerce clause, equal protection and invalid delegation of legislative authority. I do not purport by this dissent to deal with those issues. My purpose in writing this dissent is to state what I believe to be the clear legislative intent and to emphasize that this Court should not shirk its responsibility to interpret statutes according to the legislative intent even when complex constitutional issues loom on the horizon. I leave for another day and another majority, one in which I will gladly participate, the task of determining whether the mandatory licensing of degree conferral programs by a legislatively created administrative agency is constitutionally permissible. For now, it is enough to say that I believe our statutory scheme passes constitutional muster.

I also leave untouched the question of whether Nova's exclusive remedy is under the APA or whether it may initiate a separate action under the Declaratory Judgment Act and, thus, obtain discovery. I do, however, wish to make this observation: questions of law or assignments of error which, because of their nature, can be adequately handled by a reviewing court on the basis of the record of the proceedings before the administrative agency ought to be reviewable solely under the APA; claims which, by their nature, cannot be substantiated or challenged on the basis of the "cold record" ought not to be ignored merely because the APA does not provide for discovery. These latter claims, I believe, fall outside the intended coverage of the APA and may be brought under the Declaratory Judgment Act.

In conclusion, I cannot accept the majority's construction of the application of G.S. 116-15 to be dependent upon the location of

the graduation ceremony and not on the location of the teaching which forms the basis for the degree. Such a construction places form above substance, contravenes the clear legislative intent, and creates a gaping loophole in the statutory scheme for a coordinated system of higher education in this state.

Justice COPELAND joins in this dissent.