LARRY DELCONTE v. STATE OF NORTH CAROLINA

No. 9PA84

(Filed 7 May 1985)

1. Schools § 14— compliance with school attendance statutes

There are four ways by which school-aged children in this state may comply with school attendance statutes: (1) under G.S. 115C-378 a child may attend public school; (2) under this same section, a child may attend an "approved," "nonpublic school" which maintains the required records and conducts its curriculum concurrently with the local public school; (3) a child may attend a "private church or school of religious charter" which meets the requirements of Part 1, Art. 39, Chapter 115C; (4) a child may attend a "nonpublic school" which "qualifies" by meeting the requirements of Part 2, Art. 39, Chapter 115C.

2. Schools § 14— compulsory school attendance—home instruction—qualification as nonpublic school

Plaintiff's home instruction of his children meets the standards for qualification as a nonpublic school under Part 2, Art. 39, Chapter 115C where plaintiff maintains annual attendance and disease immunization records, operates on a regular schedule, is subject to health and safety inspections, administers certain standardized tests and maintains records of the test results, and provides information concerning operation of his home instruction program to appropriate state officials, and where plaintiff's home instruction meets one of the characteristics set out in G.S. 115C-555 in that it receives no state funding. G.S. 115C-555(4); G.S. 115C-556, 557, 558, and 560.

3. Schools § 14— qualification as nonpublic school—receipt of no state funding— not applicable only to established educational institutions

The Court of Appeals erred in holding that the qualification for a nonpublic school set forth in G.S. 115C-555(4) that it receive no state funding refers only to established educational institutions.

Delconte v. North Carolina

**4. Schools § 14— compulsory school attendance—home instruction not precluded**

The legislature did not intend statutes relating to compulsory school attendance to preclude home instruction simply because of some intrinsic meaning attached to the word "school."

Justice VAUGHN did not participate in the consideration or decision of this case.

ON defendant's petition for discretionary review of a decision by the Court of Appeals, 65 N.C. App. 262, 308 S.E. 2d 898 (1983), reversing a declaratory judgment for plaintiff entered by *Judge F. Gordon Battle* in the HARNETT County Superior Court.

*Thomas E. Strickland for plaintiff appellant.*

*Rufus L. Edmisten, Attorney General, by Andrew A. Vanore, Jr., Senior Deputy Attorney General, and Edwin M. Speas, Jr., Special Deputy Attorney General, for the state appellee.*

*John W. Whitehead; Holleman & Stam by Paul B. Stam, Jr. for The Rutherford Institute; Ware, Parker, Johnson, Cooke and Dunlevie by Wendell R. Bird; Richard W. Summers for the Rutherford Institute of Georgia Legal Defense Foundation, amici curiae.*

*Frank J. Sizemore, III and Richard B. Harper for The Christian Legal Society, amicus curiae.*

*Tharrington, Smith & Hargrove by George T. Rogister, Jr. and Ann L. Majestic for The North Carolina School Boards Association, amicus curiae.*

EXUM, Justice.

Plaintiff educates his children at home. The dispositive question for decision is whether plaintiff's home instruction is prohibited by our compulsory school attendance statutes.[1] We conclude that it is not. We do not, therefore, reach the question whether these statutes would violate plaintiff's constitutional freedoms if they prohibited him from so educating his children.

---

1. N.C.G.S. § 115C-378; Parts 1 and 2, art. 39, ch. 115C.

I.

Delconte instituted this action seeking a declaratory judgment that his home instruction was not prohibited by our statutes on school attendance and, if it was, then these statutes contravened certain freedoms guaranteed to him by the state and federal constitutions.

Evidence at trial tended to show the following:

In March 1981 plaintiff, Larry Delconte, moved from New York to Harnett County, North Carolina with his wife, Michelle. They have four children, two of whom, Seth James and Mia Faith, are school age. Delconte graduated from the United States Merchant Marine Academy with a degree in Maritime Science. He did substitute teaching in New York and is currently employed in North Carolina as a machinist. His wife, who finished high school and attended college for one year, is not employed.

The Delcontes are deeply religious, fundamentalist Christians and hold religious services in their home on a regular basis. They believe the Bible is authoritative and obliges them to teach their children at home.

They began educating their two oldest children, Seth and Mia, in their home while they lived in New York after being granted permission to do so from the local board of education. Delconte and his wife shared the teaching responsibilities at that time, working closely with the local school principal in obtaining materials and having Seth and Mia regularly tested.

After the Delcontes moved to North Carolina, the principal of the local public elementary school visited them to discuss the status of Seth and Mia. Subsequently, Delconte advised the Harnett County School Superintendent that he wished to continue educating his children at home. On 1 September 1981 Delconte wrote to Calvin R. Criner, State Coordinator of the Office of Nonpublic Education, requesting approval of his home as a school for the education of his children, naming his school the "Hallelujah School," and enclosing all information required by one seeking to operate a nonpublic school.[2]

2. See N.C.G.S. § 115C-560.

Criner, relying entirely upon an opinion of the Attorney General that home instruction did not fulfill the requirements of an approved nonpublic school,[3] responded on 4 September 1981 that the Hallelujah School could not be acknowledged as a non-public school "within the meaning of the law." Criner testified that he had approved a nonpublic school with as few as three students, but none with as few as two.

Delconte continued the practice he had begun in New York. He was subsequently prosecuted for violating our compulsory school attendance laws, but the state voluntarily dismissed these criminal charges.

The Delcontes still educate their children at home. They use books and materials obtained from sources in New York and the Wake Christian Academy. The instruction covers skills in basic reading, writing, and mathematics. The Delcontes have set aside a room in their home, equipped with a blackboard and desk, as a classroom. In addition to formal academic instruction, Seth and Mia's daily routine includes chores, playtime, and Bible study. The Delcontes' instruction for their children continues during most of the year. No other children are included.

Standardized test scores and school work show that both Seth and Mia are achieving at average or better than average rates academically and "getting at least a good, average educa-tion, or better." They scored in most areas in the "upper quartile"[4] for their age and grade levels and are "well-behaved . . . quite normal little children."

Delconte testified that his objections to public schools were both religious and "sociopsychological." He expressed a deep religious conviction that children should be taught at home. The Delcontes disagree with some teachings in public school. They do not believe, for example, in evolution and feel children should not be exposed to it, since for them it is contrary to the Bible.

---

3. The Attorney General has issued two such opinions. 40 Op. Att'y Gen. 211 (1969); 49 Op. Att'y Gen. 8 (1979). These opinions should be accorded some weight on the question presented, but they are not binding on this Court.

4. Mia's scores were at the "99th percentile in reading, 34th in math, 84th in language and 84th in basic." Seth, tested in grade 2, measured "at grade 4 in reading. His overall average was in the upper quartile."

Delconte explained his sociopsychological basis for home instruction in several ways: Sending children from the home at an early age signifies to them rejection by their parents. Young children are too susceptible to undesirable influences of both teachers and other students. Children should not be exposed to the community at large, either in or out of school, until they can have more of an effect on their environment than their environment can have on them.

Delconte testified:

It is accurate that my decision to teach my children in my home was a twofold decision; that there were two reasons underlying that decision. One reason I would describe as sociopsychological, common sense reasons. The other reason is religious in nature. It is a tough question for me to answer as to which of these reasons is more important. Of course, I put Jesus Christ above anything. However, either reason alone would be enough for me to want to teach my kids in the home. I can't answer the question of whether I would send my children to public or private schools if my sociopsychological objections to schooling outside the home changed. I have never had to consider that question. It is a decision that would take a lot of deep thought. It would take an exceptional child of 12 years old, I think, to be able to stand in the Christian principles that Christ has dictated to us with all these adult figures around him that are giving him a different view. I think it would be better for my children to stay home, but if and when my children are to the point that they can be more of an effect on their environment than their environment on them, I would not want them to go, but if they wanted to go and they wanted to use it as a field of witness for Christ, praise the Lord, let them go.

The trial court concluded: (1) Delconte's Hallelujah School was entitled to recognition as a qualified nonpublic school under Part 2, Article 39 of Chapter 115C. (2) If it were not so recognized, our compulsory school attendance laws would violate Delconte's religious freedoms as guaranteed by the First Amendment of the United States Constitution and Article I, section 13 of the North Carolina Constitution.

The Court of Appeals reversed. It concluded: (1) Delconte's home instruction does not constitute a qualified nonpublic school. (2) The compulsory school attendance statutes prohibit home instruction. (3) This prohibition does not violate Delconte's constitutionally protected freedoms.

We allowed Delconte's petition for discretionary review on 6 March 1984. Believing that Delconte's home instruction does qualify as a nonpublic school and is not otherwise prohibited by our school attendance statutes, we reverse the Court of Appeals.

II.

Our basic compulsory school attendance law, N.C.G.S. § 115C-378, a section of Article 29 of Chapter 115C, provides, in pertinent part:

> Every parent, guardian or other person in this State having charge or control of a child between the ages of seven and 16 years shall cause such child to attend school continuously for a period equal to the time which the public school to which the child is assigned shall be in session.
>
> . . . .
>
> The term 'school' as used herein is defined to embrace all public schools and such nonpublic schools as have teachers and curricula that are approved by the State Board of Education.
>
> All nonpublic schools receiving and instructing children of a compulsory school age shall be required to keep such records of attendance and render such reports of the attendance of such children and maintain such minimum curriculum standards as are required of public schools; and attendance upon such schools, if the school refuses or neglects to keep such records or to render such reports, shall not be accepted in lieu of attendance upon the public school of the district to which the child shall be assigned: Provided, that instruction in a nonpublic school shall not be regarded as meeting the requirements of the law unless the courses of instruction run concurrently with the term of the public school in the district and extend for at least as long a term.

Notwithstanding this statute, the General Assembly has chosen to provide that attendance at any "private church school or school of religious charter" which meets the requirements of Part 1, Article 39, Chapter 115C, or at any "qualified nonpublic school" which meets the requirements of Part 2, Article 39, Chapter 115C, "shall satisfy the requirements of compulsory school attendance." N.C.G.S. § 115C-548 and § 115C-556.

[1] Reading these statutes together so as to give effect to them all, we conclude that there are four ways by which school-aged children in this state may comply with our school attendance statutes. First, under N.C.G.S. § 115C-378 a child may attend public school. Second, under this same section, a child may attend an "approved," "nonpublic school" which maintains the required records and conducts its curriculum concurrently with the local public school. Third, a child may attend a "private church school or school of religious charter" which meets the requirements of Part 1, Article 39, Chapter 115C. Fourth, a child may attend a "nonpublic school" which "qualifies" by meeting the requirements of Part 2, Article 39, Chapter 115C.

## III.

[2] Delconte's home instruction meets all the express standards for "qualification" as a nonpublic school under Part 2, Article 39, Chapter 115C. Sections 556-558, and 560 of Part 2 require qualified nonpublic schools to maintain certain annual attendance and disease immunization records, to operate on a certain regular schedule, to be subject to certain health and safety inspections, to administer certain standardized tests and to maintain records of the test results, and to provide information concerning its operation to appropriate state officials. The trial court found, on supporting evidence, that Delconte's home instruction met all of these requirements. Neither party to the appeal disputes these findings and our review of the record suggests no error in them.

In addition, section 115C-555 requires that a qualified nonpublic school have "one or more of the following characteristics":

(1) It is accredited by the State Board of Education.

(2) It is accredited by the Southern Association of Colleges and Schools.

(3) It is an active member of the North Carolina Association of Independent Schools.

(4) It receives no funding from the State of North Carolina.

All parties agree that Delconte's home instruction receives no state funds. This is all that is required to comply with section 115C-555.

[3]  The Court of Appeals construed section 115C-555 as follows:

> All schools described by subsections (1), (2), and (3) would be established educational institutions. Subsection (4) is a general term following a list of specific terms. The rule of *ejusdem generis* dictates that 'where general words follow a designation of particular subjects or things, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designations and as including only things of the same kind, character and nature as those specifically enumerated.' *State v. Fenner*, 263 N.C. 694, 697, 140 S.E. 2d 349, 352 (1965). Therefore, we hold that G.S. 115C-555(4) refers only to established educational institutions. We reject plaintiff's contention that his home school is a qualified nonpublic school merely because it receives no state funds.

65 N.C. App. at 266-67, 308 S.E. 2d at 902-3.

We think the Court of Appeals misapplied the *ejusdem generis* canon of statutory construction. Subsection (4) of the statute does not contain "general words" following "a designation of particular subjects or things." Subsection (4) is as specific a requirement as those contained in subsections (1), (2), and (3). Each of the subsections is equally specific, discrete, and stands on its own footing. The statute clearly requires that only one of the "characteristics" be present. Delconte's home instruction meets the characteristic set out in subsection (4), *i.e.*, it receives no state funding.

We think the Court of Appeals' reading of the statute was really intended to convey its conclusion that there is something intrinsic in the meaning of the word "school" which precludes home instruction from coming within its ambit. The Court of Ap-

peals' analysis of the statute was immediately preceded by this statement:

> There is no North Carolina case interpreting the term 'school' in this statute, but the majority of other jurisdictions hold that home instruction cannot reasonably be considered a school. See, *State v. Riddle*, 285 S.E. 2d 359 (W.Va. 1981); *City of Akron v. Lane*, 65 Ohio App. 2d 90, 416 N.E. 2d 642 (1979); *F. & F. v. Duvall County*, 273 So. 2d 15 (Fla. Dist. Ct. App. 1973); *State v. Garber*, 197 Kan. 567, 419 P. 2d 896 (1966), *cert. denied*, 389 U.S. 51, 88 S.Ct. 236, 19 L.Ed. 2d 50 (1967); *State v. Lowry*, 191 Kan. 701, 383 P. 2d 962 (1963); *In Re Shinn*, 195 Cal. App. 2d 683, 16 Cal. Rptr. 165 (1961).

65 N.C. App. at 266, 308 S.E. 2d at 902. The Court of Appeals concluded its analysis of the statute by saying, "We hold that 'school' means an educational institution and does not include home instruction." *Id.* at 267, 308 S.E. 2d at 903.

## IV.

[4]   We do not agree that the legislature intended simply by use of the word "school," because of some intrinsic meaning invariably attached to the word, to preclude home instruction.

## A.

Most of the authorities relied on by the state and the Court of Appeals do not support this proposition.

The state strenuously argues, as the Court of Appeals thought, that a majority of jurisdictions hold that home instruction cannot be a "private school" under compulsory school attendance laws because of what the word "school" intrinsically means. Our analysis of the cases on the question convinces us that a majority of jurisdictions have not so held. Most of the cases relied on by the state and the Court of Appeals which hold that home instruction is not a "private school" within the meaning of compulsory school attendance statutes do so for other reasons.

California, Florida, Oregon and Virginia have, or have had, statutes which exempt school-aged children from attending public schools if they attend either private schools which meet statutory requirements or are taught in the home provided the home instruction likewise meets certain requirements. Construing these

statutes, courts in each state have concluded that "home instruction" could not qualify under the "private school" statutory standards because, in the words of the California court, "the legislature intended to distinguish between private schools, upon the one hand, and home instruction by a private tutor or other person, on the other." *People v. Turner*, 121 Cal. App. 2d 861, 263 P. 2d 685, 688 (1953); *accord, State v. M.M.*, 407 So. 2d 987 (Fla. App. 1981); *F & F v. Duvall County*, 273 So. 2d 15, 65 A.L.R. 3d 1217 (Fla. App. 1973), *cert. denied*, 283 So. 2d 564 (Fla. 1973); *Grigg v. Commonwealth*, 224 Va. 356, 297 S.E. 2d 799 (1982); *State v. Bowman*, 60 Ore. App. 184, 653 P. 2d 254 (1982). In each of these cases the court held the home instruction under consideration did not qualify for exemption because it did not meet statutory requirements for home instruction.

In California, Massachusetts, New Hampshire, Ohio and West Virginia, courts have held that home instruction did not qualify for exemption because, again, the instruction did not meet specific statutory requirements. *In re Shinn*, 195 Cal. App. 2d 683, 693-94, 16 Cal. Rptr. 165, 173 (1961) (parents did not hold proper "credentials" for a private tutor; "home instruction, regardless of its worth, is not the legal equivalent of attendance in school *in the absence of instruction by qualified private tutors*" (emphasis supplied) ); *Commonwealth v. Renfrew*, 332 Mass. 492, 126 N.E. 2d 109 (Mass. 1955) (home instruction had not received prior approval of school officials under statute which permitted exemption if a child "is being otherwise instructed in a manner approved in advance by the superintendent or the school committee"); *State v. Hoyt*, 84 N.H. 38, 146 A. 170 (N.H. 1929) (home instruction did not qualify for exemption under statute requiring "private schools" to be "approved" because the particular home instruction in question had not "been approved as required by the statute"); *City of Akron v. Lane*, 65 Ohio App. 2d 90, 19 Ohio Op. 3d 356, 416 N.E. 2d 642 (1979) (home instruction did not qualify for exemption because it was neither a "school chartered by the state" nor " 'special education program' operated pursuant to state board of education standards and authorization"); *State v. Riddle*, 285 S.E. 2d 359 (W.Va. 1981) (home instruction did not comply with statute requiring that such instruction be "approved by the county board of education" and taught by persons "qualified to give instruc-

tion" in the judgment of the county superintendent and county board).

Two jurisdictions, Washington and Kansas, have held that home instruction does not qualify for exemption from school attendance laws because it cannot be a "school" within what the court determined to be the intrinsic meaning of the word. The leading Washington case is *State v. Counort*, 69 Wash. 361, 124 P. 910 (1912). *Counort* held that home instruction was not attendance at a "private school" within the meaning of the attendance statute because the words "private school" as used in the statute "mean more than home instruction. It means the same character of school as the public school, a regular, organized and existing institution, making a business of instructing children of school age in the required studies and for the full time required by the laws of this state." 69 Wash. at 363-64, 124 P. at 911-12.

The continuing validity of *Counort*, however, is suspect in light of a later Washington case, *State v. Superior Court*, 55 Wash. 2d 177, 346 P. 2d 999 (1959), *cert. denied, Wold v. Shoreline School District*, 363 U.S. 814 (1960). Although the later case quoted *Counort* seemingly with approval, it offered a definition of "school" which is at odds with the *Counort* definition. The later Washington case said:

> A school is an institution consisting of a teacher and pupils, irrespective of age, gathered together for instruction in any branch of learning. *Weisse v. Board of Education of City of New York*, 1941, 178 Misc. 118, 32 N.Y.S. 2d 258; *Board of Education of City School District of City of Cleveland v. Ferguson*, 1941, 68 Ohio App. 514, 39 N.E. 2d 196. The three essential elements of a school are (1) the teacher, (2) the pupil or pupils, and (3) the place or institution. If the alleged school has no teacher, then it does not qualify as a school. There is one standard which the legislature made applicable to all schools, both public and private, and that standard is that the teacher must be qualified to teach and hold a teaching certificate.

55 Wash. 2d at 182, 346 P. 2d at 1002. Relying on a Washington statute that all teachers must be state certified, the later Washington case concluded that parental home instruction did not

qualify for exemption from the state's attendance law because the parents had no teaching certificate. The court said:

> The Wolds had the place [their home] and the pupil, but not a teacher qualified to teach in the state of Washington. Their alleged private school did not legally qualify as such.

*Id.*

In Kansas, the legislature before 1903 expressly provided for home instruction as a substitute for attending public or private school. In 1909 the legislature amended the school attendance law so as to omit any reference to home instruction but to provide instead that all school-aged children should attend "a public school, or a private, denominational or parochial school taught by a competent instructor . . . ." *State v. Will*, 99 Kan. 167, 160 P. 1025 (1916). In 1919 the Kansas legislature established certain "minimum course requirements for all schools, whether public, private, denominational or parochial." *In Interest of Sawyer*, 234 Kan. 436, 672 P. 2d 1093, 1097 (1983). Thereafter, in concluding that home instruction did not qualify for compliance with school attendance laws, the Kansas court relied not only on the express elimination of home instruction by its legislature but also on the failure of home instruction to meet the statutory requirements for "private, denominational or parochial" schools. *In Interest of Sawyer, supra; State v. Garber*, 197 Kan. 567, 419 P. 2d 896 (1966), *cert. denied and appeal dismissed*, 389 U.S. 51 (1967); *State v. Lowry*, 191 Kan. 701, 383 P. 2d 962 (1963).

On the other hand, Illinois and Indiana, have held that home instruction constitutes a "private school" as that term is used in school attendance laws.

In *People v. Levisen*, 404 Ill. 574, 90 N.E. 2d 213, 14 A.L.R. 2d 1364 (1950), the Illinois Supreme Court considered the question on facts similar to those before us. In that case the parents, both Seventh Day Adventists, taught their daughter at home. The mother, who had attended college for two years and had some training in pedagogy, taught her daughter third grade subjects at home using standard textbooks and keeping a regular schedule. The child showed proficiency comparable with average third grade students. *Id.* at 575-76, 90 N.E. 2d at 214. In reversing the parents' conviction for violating the state compulsory attendance

law, the Court concluded that this method of instruction constituted a "private school" as that term was used in the compulsory attendance statutes. The Court said:

> Appellants contend the State has failed to prove the child was not attending a 'private school' within the intention of the legislature. They argue that a school, in the ordinary meaning of the word, is a place where instruction is imparted to the young, that a number of persons being taught does not determine whether the place is a school, and that by receiving instruction in her home in the manner shown by the evidence the child was attending a private school. We agree with this construction of the statute. Compulsory education laws are enacted to enforce the natural obligation of parents to provide an education for their young, an obligation which corresponds to the parents' right of control over the child. *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042. The object is that all children shall be educated, not that they shall be educated in any particular manner or place. See *Commonwealth v. Roberts*, 159 Mass. 372, 34 N.E. 402. Here, the child is being taught third-grade subjects, has regular hours for study and recitation, and shows a proficiency comparable with average third-grade students. There is nothing in the record to indicate her education is in any way being neglected. We think the term 'private school,' when read in the light of the manifest object to be attained, includes the place and nature of the instruction given to this child. The law is not made to punish those who provide their children with instruction equal or superior to that obtainable in the public schools. It is made for the parent who fails or refuses to properly educate his child.

*Id.* at 577, 90 N.E. 2d at 215.

A similar result was reached under a similar rationale in *State v. Peterman*, 32 Ind. App. 665, 70 N.E. 550 (1904). There, the parents employed a tutor to teach their child in the tutor's home. The Indiana Appellate Court concluded that this kind of instruction was a "private school" within the meaning of the state's compulsory attendance law. The court said:

> A school, in the ordinary acceptation of its meaning, is a place where instruction is imparted to the young. If a parent

employs and brings into his residence a teacher for the pur-
pose of instructing his child or children, and such instruction
is given as the law contemplates, the meaning and spirit of
the law have been fully complied with. This would be the
school of the child or children so educated, and would be as
much a private school as if advertised and conducted as such.
We do not think that the number of persons, whether one or
many, make a place where instruction is imparted any less or
more a school. Under a law very similar to ours, the Supreme
Court of Massachusetts has held that the object and purpose
of a compulsory educational law is that all the children shall
be educated, not that they shall be educated in any particular
way. *Commonwealth v. Roberts*, 159 Mass. 372, 34 N.E. 402.

32 Ind. App. at 669-70, 70 N.E. at 551.

In summary, our sister jurisdictions, when faced with the
question of whether home instruction is prohibited by school at-
tendance statutes which specify various standards for nonpublic
schools, have almost always analyzed the question not in terms of
any meaning intrinsic to the word "school" but rather in terms of
whether the particular home instruction in question met the stat-
utory standards. In the absence of a clear legislative prohibition
of home instruction, we think this is the better approach to the
problem.

## B.

To require that schools, whatever their form or setting, meet
certain objective statutory standards is the approach which our
legislature has historically followed. It has never sought, and does
not now seek, to define what is, or is not, a "school." Rather, it
has historically enacted and continues to enact various objective
statutory criteria, or standards, which various kinds of schools
must meet in order for students attending them to comport with
the school attendance statutes.

The General Assembly first enacted a compulsory school at-
tendance law applicable to all school-aged children in 1923. The
law required school-aged children "to attend school continuously
for a period equal to the time which the public school in the
district in which the child resides shall be in session." Public

Laws 1923, ch. 136, § 347. In 1925 the General Assembly amended the law to add the following language:

> The term 'school' as used in this section is defined to embrace all public schools and such private schools as have tutors or teachers and curricula that are approved by the county superintendent of public instruction or the State Board of Education.
>
> All private schools receiving and instructing children of compulsory school age shall be required to keep such records of attendance and render such reports of the attendance of such children as are required of public schools; and attendance upon such schools, if the school or tutor refuses or neglects to keep such records or to render such reports, shall not be accepted in lieu of attendance upon the public school of the district, town or city which the child shall be entitled to attend: *Provided,* instruction in a private school or by private tutor shall not be regarded as meeting the requirements of the law unless the courses of instruction run concurrently with the term of the public school in the district and extend for at least as long a term.

Public Laws 1925, ch. 226; N.C. Cum. Statutes and Notes to Consolidated Statutes, p. 556 (1924-25). The 1925 amendment to the compulsory school attendance law remained unchanged until 1949 when the words "and maintain such minimum curriculum standards" were inserted in the second paragraph immediately before the words "as are required of public schools; . . . ." 1949 Sess. Laws, ch. 1033; N.C.G.S. § 115-302 (1952). These provisions of the compulsory school attendance law were rewritten in 1963, 1963 Sess. Laws, ch. 1223, § 6, and appear codified as N.C.G.S. § 115-166 (1966) as follows:

> The principal, superintendent, or teacher who is in charge of such school shall have the right to excuse a child temporarily from attendance on account of sickness or other unavoidable cause which does not constitute unlawful absence as defined by the State Board of Education. The term 'school' as used herein is defined to embrace all public schools and such nonpublic schools as have teachers and curricula that are approved by the county or city superintendent of schools or the State Board of Education.

All nonpublic schools receiving and instructing children of a compulsory school age shall be required to keep records of attendance and render such reports of the attendance of such children and maintain such minimum curriculum standards as are required of public schools; and attendance upon such schools, if the school refuses or neglects to keep such records or to render such reports, shall not be accepted in lieu of attendance upon the public school of the district to which the child shall be assigned: Provided, that instruction in a nonpublic school shall not be regarded as meeting the requirements of the law unless the courses of instruction run concurrently with the term of the public school in the district and extend for at least as long as a term.

The 1963 rewrite omitted any reference to tutors but continued to require "nonpublic schools" to have "approved" teachers and curricula, to maintain certain records and curriculum standards, to make certain reports, and to operate on a certain schedule. The standards in the public school attendance law were again amended in 1975 so as to delete the words "by the county or city superintendent of schools or" following the words "are approved by." 1975 Sess. Laws, ch. 731, § 3; N.C.G.S. § 115-166 (1978). Except for being recodified as section 115C-378 in 1981, the standards have remained as they were since the 1975 amendment.

Finally, in 1979 the General Assembly passed "An Act . . . To Deal Specifically With Private Church Schools and Schools of Religious Charter" and "An Act . . . To Deal With Certain Qualified Nonpublic Schools." 1979 Sess. Laws, chs. 505 and 506. These laws were recodified, substantially unchanged, in 1981, 1982 Sess. Laws, ch. 423, § 1, and now appear in the General Statutes as Parts 1 and 2 of Article 39 of Chapter 115C. These laws provide that attendance at a "private church school or school of religious charter" or at a "qualified nonpublic school" satisfies the requirements of compulsory school attendance. These laws eliminate the requirement that teachers or curricula at these schools be approved by any state or county official; but they require these schools to comply with certain attendance, health and safety standards, to administer certain tests, and to provide certain information to an authorized state representative. Nowhere in these recent statutes is the word "school" defined.

The upshot of this historical review is that we find nothing in the evolution of our compulsory school attendance laws to support a conclusion that the word "school," when used by the legislature in statutes bearing on compulsory attendance, evidences a legislative purpose to refer to a particular kind of instructional setting. The legislature has historically insisted only that the instructional setting, whatever it may be, meet certain standards which can be objectively determined and which require no subjective or philosophical analysis of what is or is not a "school."

We find nothing in the recent statutes now under consideration, Parts 1 and 2, art. 39, ch. 115C, which indicate a legislative intent to depart from this historical approach in deciding what kind of schooling meets the requirements of the compulsory school attendance law. Indeed, the evident purpose of these recent statutes is to loosen, rather than tighten, the standards for nonpublic education in North Carolina. It would be anomalous to hold that these recent statutes were designed to prohibit home instruction when the legislature obviously intended them to make it easier, not harder, for children to be educated in nonpublic school settings.

## C.

Finally, it is clear that if we interpreted our present school attendance statutes to preclude home instruction, serious constitutional questions would arise.

The North Carolina Constitution requires the General Assembly to permit children of this state to be "educated by other means" than in the public schools.[5] Whether these "other means" would include home instruction is a serious question which we need not, because of our resolution of the case, now address. It is clear that the North Carolina Constitution empowers the General

_____

5. Article IX, section 11 of the Constitution of 1868 provided: "The General Assembly is hereby empowered to enact that every child, of sufficient mental and physical ability, shall attend the public schools during the period between the ages of six and eighteen years, for a term of not less than sixteen months, unless educated by other means."

The 1971 amendments to the Constitution recodified the foregoing section as Article IX, section 3. This section now provides: "The General Assembly shall provide that every child of appropriate age and of sufficient mental and physical ability shall attend the public schools, unless educated by other means."

Assembly to require that our children *be educated.* Whether the constitution permits the General Assembly to prohibit their education at home is not so clear.

With regard to the federal constitution, *Wisconsin v. Yoder,* 406 U.S. 205 (1972), considered whether Wisconsin's compulsory school attendance law could be constitutionally applied so as to require Amish parents to enroll their children in public or private schools or some other educational program authorized by the statutes after the children completed the eighth grade when such enrollment would violate Amish religious tenets.[6] The Supreme Court held that to so apply the Wisconsin compulsory attendance law violated the religious freedoms guaranteed to the Amish by the First Amendment. In *Pierce v. Society of Sisters,* 268 U.S. 510 (1925), the Court held that Oregon's compulsory school attendance statute could not constitutionally be applied so as to preclude parents from sending their children to private, rather than public schools. The Court said the Oregon law "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. at 534-35. The United States Supreme Court seems to consider the right of parents to guide both the religious future and the education generally of their children to be fundamental so as not to be interfered with in the absence of a compelling state interest. *Wisconsin v. Yoder,* 406 U.S. 205; *see also, Roe v. Wade,* 410 U.S. 113 (1973). But it is not clear whether the Court would consider the right to engage in home instruction to be fundamental. *See Board of Education v. Allen,* 392 U.S. 236, 245-46 (1968).

We recognize that both *Yoder* and *Pierce* are easily distinguishable on their facts from the instant case and may not control the question of whether home instruction can be constitutionally prohibited. *See Duro v. District Attorney,* 712 F. 2d 96 (4th Cir. 1983), *cert. denied,* --- U.S. ---, 104 S.Ct. 998 (1984). We also recognize that the state has a compelling interest in seeing that

---

6. As we understand the facts in *Yoder,* the Amish practice was not to provide any formal education beyond the eighth grade for their children. This practice was based on their long held religious beliefs about the lack of value of formal education at the high school level and beyond. The Amish believed that it was better to learn-by-doing after a child completed the eighth grade and that this kind of learning better prepared their children for the life they were expected to lead in the Amish community.

children are educated and may, constitutionally, establish minimum educational requirements and standards for this education. *Wisconsin v. Yoder*, 406 U.S. 205, 239 (Mr. Justice White, Mr. Justice Brennan, and Mr. Justice Stewart concurring); *see also Pierce v. Society of Sisters*, 268 U.S. 510. Nevertheless, the principles enunciated in *Yoder* and *Pierce* raise serious questions as to the constitutionality of statutes which prohibit altogether home instruction as a means of education especially, as here, when the instruction otherwise complies with express minimum standards laid down by the legislature.

We do not, of course, purport to decide this constitutional issue. We rely, instead, on the familiar canon of statutory construction that "[w]here one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted." *In re Arthur*, 291 N.C. 640, 642, 231 S.E. 2d 614, 616 (1977); *accord Nova University v. Board of Governors*, 305 N.C. 156, 287 S.E. 2d 872 (1982).

> The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. *Even to avoid a serious doubt the rule is the same.*

*In re Dairy Farms*, 289 N.C. 456, 465-66, 223 S.E. 2d 323, 328-29 (1976), quoting *NLRB v. Jones and Loughlin Steel Corp.*, 301 U.S. 1, 30 (1936). *Accord United States v. Clark*, 445 U.S. 23 (1980); *Blasecki v. City of Durham*, 456 F. 2d 87 (4th Cir.), *cert. denied*, 409 U.S. 912 (1972).

We acknowledge that "[w]e are not at liberty to give a statute a construction at variance with [the legislature's] intent, even though such construction appears to us to make the statute more desirable and free it from constitutional difficulties." *State v. Fulcher*, 294 N.C. 503, 520, 243 S.E. 2d 338, 350 (1978). Here, though, it is not at all clear that the legislature intended the statutes relating to school attendance to preclude home instruction. Indeed, in light of the legislature's historical approach to this question, as we have pointed out above, it is probable that the legislature did not. Without a clearer expression of legislative intent on this issue we are not prepared to hold that the statutes

Delconte v. North Carolina

now under consideration prohibit home instruction as a means of complying with the compulsory school attendance law.

Whether home instruction ought to be permitted, and if so, the extent to which it should be regulated, are questions of public policy which are reasonably debatable.[7] Our legislature may want to consider them and speak plainly about them. It may determine to continue to permit home instruction relatively unregulated or to prohibit home instruction altogether. On the other hand, the legislature may determine to permit home instruction provided it meets certain minimum, objectively determinable standards relating to curricula, teacher qualifications, testing, scheduling, etc., in addition to those already provided. Whatever the legislature ultimately decides to do, we are satisfied that it would not be appropriate for us to determine whether home instruction may be constitutionally prohibited, or the extent to which it may be constitutionally regulated until the legislature has determined as a matter of public policy to prohibit it or to regulate it more closely than it now does.

For the foregoing reasons the decision of the Court of Appeals is

Reversed.

Justice VAUGHN did not participate in the consideration or decision of this case.

---

7. There is, for example, much testimony and documentary evidence in this record, largely unchallenged by the state, that home instruction at least in a child's earlier "school-age" years is actually preferable to more formal settings. According to this evidence and our own research cited earlier in this opinion, a number of states permit it. We express no opinion on whether it would be good public policy for North Carolina. That determination must be made by the legislature.