Justice BEASLEY
dissenting.
I join fully Justice Hudson’s dissent. I -write separately to explain my additional concerns with the Opportunity Scholarship Program as currently enacted. I also write to urge caution and to reiterate the State’s duties under the North Carolina Constitution “to guarantee every child of this state an opportunity to receive a sound basic education in our public schools,” Leandro v. State, 346 N.C. 336, 347, 488 S.E.2d 249, 255 (1997), and to “afford[ ] school facilities of recognized and ever-increasing merit to all the children of the State ... to the full extent that our means could afford and intelligent direction accomplish, ” id. at 346, 488 S.E.2d at 254 (emphasis added) (quoting Bd. of Educ. v. Bd. of Cty. Comm’rs, 174 N.C. 469, 472, 93 S.E. 1001, 1002 (1917)).
The Supreme Court of the United States made the following prescient observation regarding education more than sixty years ago. These words remain equally valid now.
Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening *153 the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.
Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S. Ct. 686, 691, 98 L. Ed. 873, 880 (1954), additional proceedings at 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955). Central to the Court’s decision was the understanding that “[w]e must consider public education in the light of its full development and its present place in American life.” Brown, 347 U.S. at 492, 74 S. Ct. at 691, 98 L. Ed. 2d at 880.
Free public education historically has been, and today remains, vital to American life. Its diminishment in quality or its concentration among a few invites despots to power and risks oppressing the rest. With continued necessity for preserving and promoting free public education clearly in view, I turn to the Opportunity Scholarship Program.
The Court correctly explains that our circumspect inquiry is constrained to the facial challenge presented in view of established principles of constitutional interpretation. Nonetheless, the majority’s opinion should not be read so broadly as to set an impossible standard for a facial challenge to legislation, particularly when the legislation stands to affect the education of the children of North Carolina. Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm’rs, 363 N.C. 500, 502, 681 S.E.2d 278, 280-81 (2009) (“This Court will only measure the balance struck in the statute against the minimum standards required by the constitution.”). It is well established that, subject to the constitution, it is for the General Assembly to “establish minimum educational requirements and standards.” Delconte v. State, 313 N.C. 384, 402, 329 S.E.2d 636, 647 (1985); see id. at 401-02, 329 S.E.2d at 647 (“We also recognize that the state has a compelling interest in seeing that children are educated and may, constitutionally, establish minimum educational requirements and standards for this education.” (citations omitted)). But those standards must comport with the constitutional minimum, and it has long been beyond dispute that this Court has jurisdiction to determine whether legislation meets the minimum allowed by our Constitution. E.g., Bayard v. Singleton, 1 N.C. 5 (1787).
This Court already has articulated “the minimum standards required by the constitution,” Beaufort Bd. of Educ., 363 N.C. at 502, 681 S.E.2d *154 at 281, when the General Assembly purports to provide for public education. In Leandro we “address [ed] plaintiff-parties’ constitutional challenge to the state’s public education system.” 346 N.C. at 345, 488 S.E.2d at 254. We explained that the North Carolina Constitution guarantees every child the right to a sound basic education, and we defined the mandate for public education by explaining that
[f]or purposes of our Constitution, a “sound basic education” is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student’s community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.
Id. at 347, 488 S.E.2d at 255 (citations omitted).
Although Leandro concerned public schools, this Court has established that the particular type of building in which the education occurs is immaterial. See Delconte, 313 N.C. 384, 329 S.E.2d 636 (allowing home schools). It is the opportunity for a constitutionally permissible minimum quality of education that is essential. If the General Assembly appropriates public funds[14] for public education, whether that education occurs in public schools or nonpublic schools receiving public funds, the General Assembly is limited to doing so only for the constitutionally permissible public purpose of providing a “sound basic education.” *155 When public funds are used for nonpublic initiatives to fulfill the constitutional public education mandate, the appropriation may violate the public purpose clause, especially if the grant recipients are chosen because the public school system fails to meet their educational needs.
In denying relief for plaintiffs under North Carolina Constitution Article IX, Sections 2(1), 5, and 6, the majority posits that these sections constitutionally protect funds designated for education but do not limit the General Assembly’s designation of other public funds for additional nonpublic education initiatives. In setting education policy, the danger posed by the General Assembly in designating general funds for nonpublic education and a non-public puipose is that it effectively undermines the support the legislature is constitutionally obligated to provide to the public school system. Because the Opportunity Scholarship Program circumvents the mission of public schools to successfully offer a sound basic education to all students, the General Assembly has failed to meet the mandated minimum standard.
Given North Carolina’s history of public education and the State’s continued efforts to address shortcomings to deliver on its constitutional mandate, the General Assembly’s decision to pursue vouchers at this time and in this way is vexing.[15] The majority notes that the purpose of the grants is to address grade level deficiencies of a “large percentage of economically disadvantaged students,” but as shown below, it is unclear whether or how this program truly addresses those children’s needs. While every member of this Court fully recognizes the legislature’s responsibility to implement education policy and its right to pursue novel approaches, Redev. Comm’n v. Sec. Nat’l Bank of Greensboro, 252 N.C. 595, 612, 114 S.E.2d 688, 700 (1960), this Court should not permit the State to lessen its obligation to the children of North Carolina.
In endeavoring to provide its citizens with a sound basic education, North Carolina has long embraced a complex variety of educational initiatives, including public schools, secular and sectarian private schools, and home schools. See generally M.C.S. Noble, A History of the Public Schools of North Carolina (1930) (discussing the history of public education in North Carolina, including the development of curricula, *156 religious instruction in public schools, teachers’ qualifications, and segregated schools); see also Delconte, 313 N.C. at 397-400, 329 S.E.2d at 645-46 (summarizing the development of public education legislation). Our legislature has met the standard with varying degrees of success. It is worth observing that our General Assembly previously embraced vouchers for approximately a decade as a means to avoid the State’s obligation under the U.S. Constitution to desegregate public schools as required by the Supreme Court of the United States in its seminal Brown v. Board decisions. See Milton Ready, The Tar Heel State: A History of North Carolina 349 (2005) (describing the “Pearsall Plan” as “a stubbornly conservative strategy that eventually satisfied no one”); id. at 355-56 (explaining that beginning in the 1960s and 1970s, “ [sophisticated racial and segregationist appeals.... took on a more abstract form” and “[m]any of the newer strategies came wrapped in terms as local control, vouchers, charter schools, tax cuts, distributive welfare, and limited government interference in the private affairs of ordinary citizens”); see also Hawkins v. N.C. State Bd. of Educ., No. 2067, 11 Race Rel. L. Rep. 745 (W.D.N.C. Mar. 31, 1966) (declaring the Pearsall Plan facially unconstitutional). Indeed, some of our schools are only now achieving unitary status under long-standing federal orders to desegregate. E.g., Everett v. Pitt Cty. Bd. of Educ., 788 F.3d 132 (4th Cir. 2015). Even those victories, however, are tempered by a different reality:
The rapid rate of de facto resegregation in our public school system in recent decades is well-documented. As one scholar put it, “Schools are more segregated today than they have been for decades, and segregation is rapidly increasing.” Erwin Chemerinsky, Separate and Unequal: American Public Education Today, 52 Am. U. L. Rev. 1461, 1461 (2003) (footnote omitted); see also Lia B. Epperson, Resisting Retreat: The Struggle for Equity in Educational Opportunity in the Posh-Brown Era, 66 U. Pitt. L. Rev. 131, 145 (2004) (“American public schools have been steadily resegregating for more than a decade, dismantling the integrative successes of hundreds of districts that experienced significant levels of integration in the wake of Brown and its progeny. Such racial isolation in public schools is worse today than at any time in the last thirty years.”).
Id. at 150-51 (Wynn, J., dissenting).
For now, as noted by the majority, the program is available only to lower-income families. This availability assumes that private schools are *157 available within a feasible distance, that these families win the grant lottery, and that their children gain admission to the nonpublic school of their choice. With additional costs for transportation, tuition, books, and, at times, school uniforms, for the poorest of these families, the “opportunity” advertised in the Opportunity Scholarship Program is merely a “cruel illusion.” Tenn. Small Sch. Sys. v. McWherter, 851 S.W.2d 139, 154-55 (Tenn. 1993) (“[Educational opportunity of the children in this state should not be controlled by the fortuitous circumstance of residence .... Such a system only promotes greater opportunities for the advantaged while diminishing the opportunities for the disadvantaged.. .. ‘The notion of local control was a “cruel illusion” for the poor districts due to limitations placed upon them by the system itself....”’) (first and second ellipses in original) (quoting Dupree v. Alma Sch. Dist. No. 30, 279 Ark. 340, 346, 651 S.W.2d 90, 93 (1983)) (third ellipsis in original))).
Without systemic and cultural adjustments to address social inequalities, the further cruel illusion of the Opportunity Scholarship Program is that it stands to exacerbate, rather than alleviate, educational, class, and racial divides. See generally Julian E. Zelizer, How Education Policy Went Astray, The Atlantic (Apr. 10, 2015), http://www.theatlantic.com/ education/archive/2015/04/how-education-policy-went-astray/390210/ (last visited July 16, 2015) (discussing changes in American education policy over the past fifty years and the relationship between continually failing education policy and economic inequality). See also Br. for N.C. Conference of the NAACP as Amicus Curiae Supporting Plaintiff-Appellees at 3-9, Hart v. State, _ N.C. _, _ S.E.2d _ (2015) (No. 372A14) (discussing discriminatory “creaming” and “cropping” practices by which private schools admit “the best and least costly students” or “deny[ ] services and enrollment to diverse learners” (citations omitted)). In time, public schools may be left only with the students that private schools refuse to admit based on perceived lack of aptitude, behavioral concerns, economic status, religious affiliation, sexual orientation, or physical or other challenges, or public schools may become grossly disproportionately populated by minority children. The policy promoted by the Opportunity Scholarship Program, therefore, may serve to widen already considerable gaps and create a larger class of underserved children.

. The General Assembly is conspicuously careful to avoid acknowledging that the grants at issue are public funds. See, e.g., N.C.G.S. § 115C-555 (2013) (“For the purposes of this Article, scholarship grant funds awarded pursuant to Part 2A of this Article to eligible students attending a nonpublic school shall not be considered funding from the State of North Carolina.”) (emphasis added); id. § 1150-562.1(6) (2013) (defining “Scholarship grants” as “Grants awarded annually by the Authority to eligible students”). The majority correctly notes that the program is funded through appropriations from the general revenue of the Board of Governors of The University of North Carolina

. There may be instances when the use of public funds for nonpublic schools can serve a public purpose. While public schools are supposed to accommodate all students’ educational needs, some circumstances exist in which the public purpose may be best met by funding a nonpublic educational situation, such as the education of children with disabilities under North Carolina General Statutes Chapter 115C, Subchapter IV, Article 9. This issue, however, is not before our Court at this time.